# WILLCOX & GIBBS SEWING MACHINE COMPANY
## *v.* EWING.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

No. 64. Argued October 29, 1891. — Decided November 16, 1891.

A contract of agency, which leaves the agent free to terminate his relations with the principal upon reasonable notice, must be construed to confer the same right upon the principal, unless provisions to the contrary are stipulated.

A provision in a contract, otherwise terminable upon reasonable notice, that a violation of the spirit of the agreement shall be a sufficient cause for its abrogation, does not imply that it can be abrogated only for sufficient cause.

The plaintiff in error by contract appointed the defendant in error "its exclusive vendor" for its machines in a defined territory; agreed to sell the machines to him at a large discount from its retail New York prices; and not to "knowingly supply its goods at a discount to go within that territory." The defendant in error accepted the appointment; agreed to pay for the machines at the discount rate; not to sell them below the said retail rate; and not to solicit orders within the territory of other agents. *Held,* that the agreement constituted him agent within the defined territory.

The court stated the case as follows:

This writ of error brings up for review a judgment based upon a verdict for $15,000 as the damages which a jury found

were sustained by the defendant in error, Ewing, on account of an alleged breach of a written contract between him and the Willcox and Gibbs Sewing Machine Company, the plaintiff in error, of date October 15, 1874. The case depends upon the construction of that contract.

On the 16th of May, 1867, the parties entered into a written agreement, reciting that the company's "agency" for Philadelphia and vicinity had been conducted by Ewing, and that a settlement of accounts had been made whereby the assets of such agency had been transferred to him. In view of that settlement, and to secure the interests of both parties, it was agreed, for considerations mutually satisfactory, that the company should furnish Ewing such Willcox and Gibbs sewing machines as he might order, at a discount of forty per cent from its list price so long as the list remained unchanged, and three dollars per machine in addition to that forty per cent; that whenever the price was changed due notice was to be given Ewing, and a discount made upon the basis of the then cost of a machine to the company and its then retail price, which should bear the same proportion that the above discount and three dollars per machine bore to such cost and retail price; and that parts of, and attachments to, the machines should be furnished at a discount of forty per cent, and cabinet work, needles and any attachments that cost the company more than sixty per cent of its retail price, at net cost. In consideration of the premises Ewing agreed to continue the business, then established in Philadelphia, of the sale of these sewing machines, and, in good faith, to devote his entire time and energy to its advancement and improvement, and to the increase of the sale of the machines, as fully and energetically as he had done the previous year; and so long as he faithfully did so and in good faith kept at least the sum of $25,000 actively employed therein, the company "agreed to continue, and in equal good faith, carry out all the provisions" of the agreement.

The company agreed to convey to Ewing, by proper writing, the lease of the property in Philadelphia in which the business was then carried on, to be used for the purposes stated in the

contract. In consideration of the premises, and so long as Ewing faithfully performed the agreement on his part, he was to have the exclusive sale of the Willcox and Gibbs sewing machine, its attachments and parts, in certain defined portions of Pennsylvania, New Jersey, West Virginia and Ohio; the company reserving the right to sell their machines and accessories at their retail prices only to go into such territory. It was also provided that "the agency, or, in other words, the interest in the Willcox and Gibbs sewing machine business" conveyed to Ewing was not to be sold or assigned by him without the company's consent, but such consent was to be given if the party was acceptable to it.

On the day of the execution of the above agreement the company gave this receipt: "Received from Daniel S. Ewing, of Philadelphia, twenty-five thousand three hundred and ninety-eight $\frac{48}{100}$ dollars, which is the balance due this company from the Philadelphia office to the 15th inst., the payment of which by the said D. S. Ewing transfers to him all our interest in the stock, fixtures, book ac., etc., of said office."

Under the date of October 15, 1874, the parties signed a memorandum, in which it was stipulated that a new agreement should be entered into between them containing certain specified terms, "the making of which it is hereby understood shall nullify all former contracts and agreements made prior" to that date. This writing closed with these words: "Above is substantially our mutual understanding of what the new contract is to be." On the same day the new contract — the one in suit — was reduced to writing and signed. It does not vary from the memorandum of the same date in any respect material to the present controversy. As the case depends upon the construction of the last agreement, it is given in full, as follows:

"This agreement, made and entered into this fifteenth day of October, one thousand eight hundred and seventy-four, by and between the Willcox and Gibbs Sewing Machine Company, a corporation duly organized under the laws of the State of New York, of the first part, and Daniel S. Ewing, of the city of Philadelphia, Penn., of the second part, witnesseth:

"The first party hereby appoints, subject to conditions hereinafter expressed, the second party its exclusive vendor for its sewing machines, parts and attachments, in and for the following-named territory, to wit: the city of Philadelphia, Pa. and the adjacent country lying within a radius of ten miles from the city hall of said city. The second party hereby accepts said appointment. The first party will sell for the present to second party its sewing machines and parts thereof at 60 per cent discount from its present New York retail price list, and its needles, attachments, silk and cotton at its lowest wholesale rates. In the event of a change (the liberty to effect which is not herein intended to be restricted) in retail prices or of a general revision of discounts by first party, the second party is to be as favorably considered then in the readjusting and fixing of discount rates to him as is extended to him on present basis of prices. All bills owing from second to first party shall be paid in cash 30 days from date of same. The first party will not knowingly supply its goods at a discount to go within the limits of territory hereby assigned; but the first party reserves the right always to sell its sewing machines, parts and accessories at full retail rates to go anywhere. The established retail prices of first party are to be maintained for retail trade, and the second party is bound to sustain them and will bind all subvendors or agents of his to sustain said established retail prices. Second party will be allowed to fill orders from any locality at full list rates, but trade must not be solicited by his connivance or consent in the territory of other agents, and discounts or any equivalent device therefor must not be allowed in any form on articles herein specified permitted to go out of his own territory. Machines or parts, needles or attachments counterfeiting, infringing or in any degree trespassing upon ours, or in any effect trading upon our name, must not be dealt in or countenanced by second party, but it is hereby agreed that his time, attention and abilities must primarily be devoted to the forwarding of the interest of the party of the first part. If, for any reason, at any time the connection hereby formed shall cease, the first party shall have the right to buy back of its goods

sold to second party all such goods as first party may select; first party to pay therefor same prices as charged second party.

" Second party agrees to purchase from first party during the year 1875 at least $20,000, net, worth of machines, parts and accessories, to be taken in equal monthly parts, and to be paid for as stated herein. Violation of the spirit of this agreement shall be sufficient cause for its abrogation. Permission is granted second party to trade in all former territory occupied by him until such time as first party shall form other connections for occupying the territory not contained in that designated therein as belonging to second party.

" And it is agreed and understood that this appointment or agency is not salable or transferable by second party without obtaining the written consent of first party, but such consent is to be given providing the purchaser or other person is acceptable to said first party. First party consents to renew and extend second party's note, $10,000, maturing January 23–26, 1875, for one year from said date, without interest, upon consideration of this agreement alone. All contracts or agreements made prior to the date first written above are hereby nullified and satisfied."

Subsequently, February 15, 1877, Ewing executed the following receipt, which was endorsed on the contract: ." Received, New York, Feb'y 15, 1877, the sum of four hundred and twenty $\frac{52}{100}$ dollars, making the discount up to 55 per cent on all goods received by me since the revision of discounts in August, 1875, same amount being in full for all claims or demands for arrears of discounts, allowances or any other claims I may have up to date hereof. In consideration whereof I also now confirm the within contract, admitting the company's right to revise discounts or prices as in its judgment it may deem proper and just, in conformity with the within contract. D. S. Ewing."

The parties continued to act under the agreement of 1874 until the latter part of 1879. On the 10th day of October of the latter year the company notified Ewing of their purpose to abrogate their agreement at the expiration of sixty days

from that date, saying : . "In the meantime, the company will be ready and willing to take off your hands the store now occupied by you, and they will purchase, if you desire to sell, the fixtures contained in the store at a just valuation. They will also purchase all stock which you have on hand which has been obtained from the said company, in accordance with the terms of their contract. Should you be desirous of terminating the said agreement at an earlier period than the time herein designated, the company will join with you in an agreement for such earlier termination of the contract." In reply to this notice, Ewing wrote to the company : " I do not accept notice for the abrogation of the contract existing between us, for the reason that I deny your right thus, or by any arbitrary process, to determine said contract. Should you wish to open negotiations for the purchase of any thing, right or privilege which I hold, that may be of value to you, I shall be pleased to receive communications bearing upon the subject."

At the trial of the present action, brought to recover damages for breach by the company of the contract of 1874, Ewing introduced the agreement of 1867, and gave evidence tending to show the value of the business in that and succeeding years, his faithful performance of the contract, and the damages he had sustained by reason of the alleged breach. To the introduction of that evidence the company objected, but the objection was overruled, and an exception taken. The defendant did not introduce any proof, but insisted at the trial and insists here, that it appeared from the evidence that Ewing, prior to the abrogation of the contract, did not give his time and labor, primarily, for the benefit of its business in his hands.

The defence was based, in part, upon the broad ground that the contract of 1874 was revocable at the will of the company, or, at least, upon reasonable notice to Ewing; and, as by the uncontradicted evidence sixty days' notice was given of the purpose to abrogate it, that the law was for the company. The court refused to so charge the jury, and instructed them, in substance, that the plaintiff was entitled to recover any

· damages sustained by reason of such abrogation, unless it was shown that he failed to devote his time, attention and abilities, in good faith and primarily, to forwarding the company's interests as they were involved in the execution of the contract.

*Mr. Wayne Mac Veagh* for plaintiff in error. *Mr. A. H. Wintersteen* was with him on the brief.

*Mr. Frank P. Prichard* for defendant in error. *Mr. John G. Johnson* filed a brief for same.

I. The contract in suit was one of sale, not of agency.

The right conferred upon Ewing was analogous to that conferred upon the licensee of a patent. The nature of such licensee's right has been very clearly considered by this court recently in the case of *St. Paul Plow Works* v. *Starling*, 140 U. S. 184.

Ewing was not constituted an agent to sell on behalf of the defendant, for its account, its machines. It was made his duty to purchase for himself, and to pay for, the machines which he desired to sell. The defendant agreed with him that it would furnish to him, to be sold by him, for his own account, within a designated territory, its machines. It further agreed that within said territory he alone should be allowed to sell the same.

It seems too plain for argument that the agreement by the defendant with the plaintiff was one of sale and not of agency. It not only conferred upon the latter the right to sell, but it excluded others from selling.

. Was this agreement one of sale only so long as the defendant desired to sell, or one to sell to him without limit of time?

The agreement by Ewing "to purchase from first party during the year 1875 at least $20,000 net worth of machines, parts and accessories to be taken in equal monthly parts and to be paid for as stated herein," was not one which it was competent for the defendant at will to revoke. This agreement, by itself, is sufficient to show that the provision was

one, not at will, but for a time, and for a time not terminable with the year 1875.

Inasmuch as the contract was not to be at will, it was to have *some* duration. The least extent which can be given it is for the life of Ewing, or during the continuance in business of the defendant. An agreement to run for *some* time, not limited, cannot be otherwise construed.

II. The contract of 1867 was properly admitted in evidence.

The contract of 1867 was admissible in evidence not only as throwing some light upon the question of the value of the contract broken, but also for the purpose of showing the fact that the agreement of 1874 rested upon a consideration.

The contract of 1874 stated that "All contracts or agreements made prior to the first date written above are hereby nullified and satisfied."

It was the right of the jury to know that a consideration had been given. It was impossible to correctly understand the relation established by the contract of 1874 without a knowledge of the situation. It was not claimed that the contract of 1867 was admissible to modify, to alter, or to vary that of 1874, but simply to show that the parties had dealt together previously about the same subject matter, and that the new agreement grew out of such past relation. Though the learned judge did not admit the contract of 1867 for this purpose, we submit that he should have done so.

III. The value paid to the defendant by the plaintiff for the exclusive right to sell its sewing machines in 1867, in connection with the oral testimony, was pertinent to the issue raised as to the amount of damages due the plaintiff.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

If this action was based upon the agreement of 1867, there would be some ground for holding that the company was obliged, by that agreement, to continue Ewing as agent so long as he performed its stipulations. We are only concerned, however, with the agreement of 1874, which materially differs

from that of 1867, and expressly provides that all prior contracts between the parties "are hereby nullified and satisfied." It is only for a breach of the contract of 1874 the plaintiff sues. Looking at all the provisions of the last agreement, it is clear that Ewing — although bound, while the contract was in force, to devote his time, attention and abilities, primarily, to the interests of the company, within the territory allotted to him — was not compelled to continue in its service for any given number of years, at least after 1875, or indefinitely, but was at liberty after that year, if not before, upon reasonable notice, to surrender his position and quit its service, subject to the company's right to buy back such of its goods sold to him as it might select, and for the prices at which they were charged to him. He may have been entirely satisfied with the manner in which the company acted towards him, and yet may have preferred — it is immaterial for what reason — not to remain in its service after 1875, or to continue in the business of selling sewing machines. We specify the year 1875, because Ewing agreed to purchase, during that year, $20,000 of the company's machines. But he did not bind himself to purchase any given number during subsequent years. It would be a very hard interpretation of the contract to hold that he was bound by the agreement of 1874 to serve the company within the designated territory so long as it kept the contract, and was satisfied with him as its agent. None of its provisions would justify such an interpretation.

If Ewing had the privilege, upon reasonable notice, of severing the connection between him and the company after 1875, upon what ground could a like privilege be denied the company if it desired to dispense with his services? He contends that his life, or the continuance of the company in business, was the shortest duration of the contract, consistently with its provisions, provided he did his duty. This position is untenable. His appointment was made and accepted subject to the conditions expressed in the agreement. No one of those conditions is to the effect that so long as he devoted his time, attention and abilities to the company's business, he should retain his position as its exclusive vendor, within the territory named,

without regard to its wishes. If the parties intended that their relations should be of that character, it was easy to have so stipulated. The only part of the contract that gives color to the theory for which the plaintiff contends, is the part declaring that a violation of the spirit of the agreement "shall be sufficient cause for its abrogation." This clause, it may be suggested, was entirely unnecessary if the parties retained the right to abrogate the contract after 1875, at pleasure, and implies that it could be abrogated only for sufficient cause, of which, in case of suit, the jury, under the guidance of the court as to the law, must judge in the light of all the circumstances. We cannot concur in this view. The clause referred to is not equivalent to a specific provision declaring, affirmatively, that the contract should continue in force, for a given number of years, or without limit as to time, unless abrogated by one or the other party for sufficient cause. It was inserted by way of caution, to indicate that the parties were bound to observe equally the spirit and the letter of the agreement while it was in force.

There was some discussion at the bar as to whether Ewing was, strictly, an agent of the company. We think he was. He was none the less an agent because of his appointment as "exclusive vendor" of the defendant's machines within a particular territory, or because of the peculiar privileges granted to or the peculiar restrictions imposed upon him. One clause of the contract prohibits him from soliciting trade, directly or indirectly, in the territory "of other agents;" another, that he will bind "all sub-vendors or agents" to sustain the established retail prices of the company; and still another imposes restrictions upon the sale of his "appointment or agency." The agreement constituted him the sole agent of the company for the sale of its machines within a certain territory. It is true that the machines he undertook to sell were to be purchased by him from the company at a large discount. But he could not sell them by retail below the regular retail prices. This arrangement was the mode adopted to protect the company's interests, and to secure the plaintiff such compensation for his services as would induce him to devote his

time, attention and abilities to the company's interests.   He was still a mere agent to sell such machines as might be delivered to him under the contract.   We perceive nothing in the agreement of 1874 to take the case out of the general rule that "the principal has a right to determine or revoke the authority given to his agent at his own mere pleasure; for, since the authority is conferred by his mere will, and is to be executed for his own benefit and his own purposes, the agent cannot insist upon acting when the principal has withdrawn his confidence, and no longer desires his aid."   Story on Agency, §§ 462, 463.   So far as the company's power of revocation is concerned, the case is not materially different from what it would be if the plaintiff had agreed to sell such machines as were delivered to him at the established retail prices, receiving, as compensation for his services, the difference between those prices and the amount he agreed to pay for them under the contract of 1874.   In either case, his relation to the company would be one of agency, that could be terminated at its will or by renunciation upon his part, at least after 1875.   Of course the revocation by the principal of the agent's authority could not injuriously affect existing contracts made by the latter under the power originally conferred upon him.

For the reasons stated the court below erred in not instructing the jury, as requested, to return a verdict for the defendant.

*The judgment is reversed, with directions to grant a new trial, and for further proceedings consistent with this opinion.*

MR. JUSTICE BRADLEY and MR. JUSTICE GRAY did not hear the argument or take part in the decision of this case.