## CHAMPION SPARK PLUG CO. v. AUTOMOBILE SUNDRIES CO.

(Circuit Court of Appeals, Second Circuit. April 6, 1921.)

### No. 142.

1. **Principal and agent** ⬤══41—**Breach by sales agent held to justify refusal of principal to perform.**

   Where a sales agent to sell spark plugs in foreign countries breached its contract by selling plugs delivered to it for export in the domestic market, such breach justified its principal in refusing to fill any more orders, unless the principal had waived the breach.

2. **Principal and agent** ⬤══41—**Evidence held sufficient to take to the jury the question whether the principal had waived his agent's breach.**

   In an action against a manufacturer by agent for sale in foreign countries, for the manufacturer's refusal to fill the agent's orders, evidence of negotiations between the parties and the filling of subsequent orders, after the manufacturer had charged the agent with breach of contract by selling in the domestic market, *held* sufficient to take to the jury the question whether the manufacturer had waived the agent's breach.

3. **Contracts** ⬤══316(1)—**"Waiver" of breach must be intentional.**

   "Waiver" is an intentional abandonment or relinquishment of a known right or advantage, oversight, carelessness, and thoughtlessness being in-

sufficient; so that, to establish a waiver of a breach of a contract, there must appear an intention to relinquish the right to take advantage of the breach.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Waiver.]

**4. Contracts ⬦316(1)—Waiver does not require new consideration.**

Waiver of a breach of an existing contract does not require or depend on a new contract or a new consideration.

**5. Contracts ⬦316(6)—Waiver of breach cannot be recalled.**

Waiver of a breach of a contract does not depend on estoppel, and, once made, cannot be recalled or expunged.

**6. Contracts ⬦322(3)—Waiver of breach may be proved by express declarations or by acts.**

Waiver of a breach of contract may be proved by an express declaration of the party charged with the waiver, or by acts or language inconsistent with the purpose to stand on his rights.

**7. Contracts ⬦323(1)—Waiver is question for jury, if facts or inferences are indisputable.**

Waiver of breach of contract is a question of law, if resting on an express declaration, or on undisputed acts or language so inconsistent with the purpose to stand on the breach as to leave no opportunity for a reasonable inference to the contrary; but if the acts or declarations relied on are denied, or if the established facts permit reasonable minds to differ as to the inferences from them, it is a question of fact for the jury.

**8. Appeal and error ⬦1001(1)—Jury's findings on questions supported by evidence are controlling.**

The findings by the jury on questions of fact, which have some evidence to support them, are controlling.

**9. Principal and agent ⬦47—Sales agent's contract held to create relation of principal and agent, as well as seller and buyer.**

A contract whereby a manufacturer appointed a dealer as its exclusive sales agent in foreign countries, and provided for sale of its goods to the sales agent at specified prices, creates the relationship of principal and agent, as well as that of seller and buyer, so that the agent owes the duty of complete fidelity to its principal.

**10. Principal and agent ⬦47—Sales agency contract held not to cover rights to brands subsequently acquired.**

A contract by a manufacturer, appointing a distributor as its exclusive foreign sales agent for a specified line of spark plugs, does not give the distributor the exclusive agency of other brands of spark plugs, which were acquired by the manufacturer subsequent to the contract, and were thereafter manufactured under their original trade-names.

**11. Principal and agent ⬦41—Agent's acceptance of commissions on manufacturer's sale in agent's territory waives manufacturer's breach by such sale.**

The breach of a contract giving a distributor exclusive sales agency in foreign countries is waived, where the agent accepts from the manufacturer commissions on sales made by the manufacturer within its territory.

**12. Principal and agent ⬦41—Exclusive sales agent cannot recover lost profits, if it could have purchased goods in market.**

A sales agent cannot recover from the manufacturer, as damages for breach of the agency contract, the profit which the agent would have made on goods ordered of the manufacturer, and which the latter refused to ship, where the agent could have purchased the same or similar goods in the open market, and thereby have filled its resale contracts, since the agent was bound to minimize the damages.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**13. Sales ☞418(12)—Buyer can recover lost profits on resale contract known to seller.**

Where goods are bought for the purpose of performing a contract for their resale, and this purpose is known to the seller, who agrees to make deliveries to enable the buyer to perform the resale contract, the buyer can recover from the seller as damages for breach of his contract the profits it would have made on the resale.

**14. Principal and agent ☞41—Evidence of sales as parts of automobile held not admissible in action for breach of sales agency for spark plugs.**

In an action by a sales agent for breach of its exclusive agency for spark plugs, evidence that the manufacturer's spark plugs were included as standard equipment for an automobile sold in the agent's territory is inadmissible to show damage, since the agent can recover only for sales which it could have made in the absence of the alleged competition.

**15. Principal and agent ☞41—Expenses of conducting business must be proved, to sustain recovery for lost profits to end of contract of exclusive sales agency.**

In an action for a breach of contract, giving plaintiff exclusive sales agency for defendant's spark plugs in foreign territory for a limited time, plaintiff cannot recover for loss of expected profits between the time of defendant's breach of the contract and the end of the term, without proving the probable cost of conducting the business during that time.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Automobile Sundries Company against the Champion Spark Plug Company, for breach of a contract. Judgment for plaintiff, and defendant brings error. Reversed.

For convenience, we shall refer to the parties as plaintiff and defendant. The plaintiff is an Ohio corporation, and the defendant a New York corporation. Under date of July 15, 1913, a contract was entered into between the plaintiff and defendant. This contract provided that plaintiff be made and constituted the "sales agent and distributor" of the defendant, with exclusive and sole right to sell and distribute the products of the defendant, known as spark plugs, in the territory described as follows: "All foreign countries outside of the boundary limits of the United States, including dependencies and possessions of the United States of America, with the exception of the Dominion of Canada and British Columbia." It provided as to the prices of "regular" Champion plugs, all types and sizes, "Champion X" and "Champion priming plugs." No other plugs are referred to in the contract. It further provided: "The first party [defendant] agrees that during the life of this agreement it will not sell or cause any of its articles to be sold in the above-described territory, except through the second party [plaintiff], and to refer all inquiries concerning its product from the above-described territory that may be received by it through any source or by any means whatsoever to the second party [plaintiff] for attention."

It further provided that the plaintiff use its best efforts in promoting the sales of the products of the defendant and to cover the territory by "agents, traveling representatives, correspondents, and other methods at its command to increase the business in the products of the defendant," and further "the first party [defendant] shall as far as able furnish the second party [plaintiff] promptly with such qualities of any of its products as the second party may require," and "it shall not advance the prices on its product to the second party beyond those in effect on the date of the execution thereof, and shall give the second party at all times the benefit and advantage of its lowest published prices and discounts on its products, * * * shall furnish the second party from time to time with reasonable quantities of literature and cuts for circularizing and promoting the sale of its products contemplat-

ed by this agreement, such literature to bear the name of the second party as the sole foreign distributor for the product of the first party," and further "the second party [plaintiff] shall order not less than 100,000 Champion spark plugs of assorted sizes in lots of 200 or over, as its needs may require during the first year of the term of this agreement, and an increase of 33⅓ per cent. each succeeding year over the preceding year during the term of this agreement, and, failing to do' so, the first party [defendant] may, at its election at any time thereafter terminate this agreement by giving not less than 30 days' notice in writing to the second party," and further "it is further agreed that spark plugs furnished the second party at the special prices herein indicated, are for export only, * * * and the second party agrees to push the sale of Champion spark plugs in preference to any other makes, but does not agree not to sell any other plugs for which it may receive orders."

Claiming a breach of this contract, the plaintiff instituted this action upon a complaint which contains six causes of action, and demanded judgment for $353,000. The defendant interposed an answer which. in addition to affirmative defenses, set up a counterclaim and demanded judgment thereon for $130,000. It appears from the contract that the defendant had brands of spark plugs under the three specifications of "Champion." The plaintiff, by the terms of the contract, was made the sales agent and distributor exclusively for foreign territory. It therefore had no right to enter the domestic market and sell the defendant's product. But it is quite clearly established, and, indeed, admitted by the plaintiff, that, in violation of the terms of its contract, the plaintiff not only entered the domestic market and sold the defendant's products, the Champion spark plugs, but did so at reduced prices. Charged with the breach of this obligation, the plaintiff at first made denial thereof, but subsequently admitted that it sold in the domestic market. This constituted a breach of the contract, and of itself would be sufficient to defeat the plaintiff. It was contended below, and it is here, that, after entering the domestic market and selling plugs, the defendant accused the plaintiff thereof, and at a conference had at Toledo, Ohio, the defendant expressly waived this breach of the contract. This meeting took place on September 28, 1916. On the 25th of September, 1916, the defendant wrote a letter to the plaintiff, canceling the contract, giving as the reason that in violation of the contract the plaintiff had entered the domestic market, to the defendant's damage. Mr. Walters, the president of the plaintiff company, testified that he and the vice president, on their way to this meeting from New York to Toledo, discussed the question of whether they would make a clean breast of their violation of the contract, but they determined not to do so. At this conference, Mr. Walters testified that, after the denial of having sold in the domestic market, it was agreed by the defendant to make deliveries of other plugs ordered, and that thereafter shipments were made and the business relations of the parties continued. Thereafter, it is clear, the plaintiff continued to sell in the domestic market. and further complaint was made in correspondence which ensued. A meeting was held on November 24, 1916, at a hotel in New York City, where the defendant was represented by its sales manager, and it was testified by plaintiff's president that the sales manager said at this conference: "You want to stop writing those letters. * * * They'll only get you in trouble, and we'll start a clean slate now. Let bygones be bygones. Everything will be all right, but don't sell any more plugs in the domestic field." Later other shipments of plugs were made to the plaintiff. On February 5, 1917, the defendant gave final notice that it would no longer ship plugs to the plaintiff, and none were shipped after this date.

The first cause of action seeks to recover $25,000 for an order given for plugs on July 28, 1916; the second cause of action seeks to recover $5,000 damages for a failure to supply an order for 100,000 plugs, which order was given on December 7, 1916; and the third cause of action seeks to recover damages for orders given between January 30, 1915, and August 4, 1916. The fifth and sixth causes of action are for loss of profits due to failure to carry out the terms of the contract, by which failure the plaintiff lost profits during the periods mentioned in the second amended complaint. It is apparent that

no orders were received for spark plugs, and no orders were in existence or received by defendant for spark plugs, such as are mentioned in the third and fifth causes of action, at the time of making the contract. In September, 1914, the defendant bought out the business and took on new lines, buying out other manufacturers of spark plugs, to wit, the Jeffery De Witt Company, of Detroit, and the Star Specialty Company, of Chicago. The former manufactured the line known as the "J–D," which were manufactured and marketed as such. The Star Specialty Company placed upon the market and sold the brands of plugs herein referred to as "Ajax" and "Star." These lines were separately advertised and catalogued, and distinctly known and sold under such brands. There is no evidence to show that at the time of the making of the contract it was known or contemplated that the defendant would purchase either of these companies or handle their brands.

The plaintiff contended upon the trial, and was permitted to offer proof to substantiate a loss of profit due to failure of the defendant to supply it with these brands for sale in foreign markets. There is some correspondence in the record, not amounting to an admission, as to exclusive agency for these new plugs. Damages were claimed for the failure of the defendant to give the exclusive foreign agency to the plaintiff. Defendant made sales of these brands to the Lodge Sparking Plug Company, of England, and of the Champion line to the Fiat Company and Luigi Berrardo, of Italy. Upon the trial a claim was made for damages on the theory that such sales breached the contract. It further appeared upon the trial that, in the case of these latter sales (Fiat and Berrardo) to the respective companies, a commission was paid to plaintiff after explanation, and which commission it accepted with full knowledge of the facts. Upon the trial, and as sustaining a part of the third cause of action, plaintiff claimed damages for the Champion plugs shipped into the foreign territory during the life of the contract by the Ford Motor Company. The Champion X plug, standard Ford equipment, was sold at a low price to the Ford Company under the contract of 1911. Each car which the Ford Company shipped contained four Champion spark plugs, and plugs were also sent to the service stations as service stock. It appears that the Ford Motor Company did not enter into the spark plug business; that is to say, it did not place spark plugs upon the market, but used them solely for the service of customers of the Ford car. There is no evidence that the defendant instigated or otherwise caused these extra shipments so sold to the Ford Motor Company. They were sold only under the contract above referred to, and it further appears that there was no profit in such sale.

In its counterclaim the defendant alleges that there were some open charges which the plaintiff has not paid in full, and that the plaintiff so appropriated spark plugs which were furnished as to deliver them under a different cost price than that intended by the parties under the terms of the contract. In addition thereto, it is claimed that the plaintiff registered a trade-mark under the name of "Champion" for the Argentine Republic, India, and the Union of South Africa. It is claimed that as a result thereof the defendant was unable to sell these products in these countries, and therefore the plaintiff has committed a breach of the contract, which gives rise to the claims set forth in the set-off and counterclaim.

Judgment was rendered for the plaintiff. Defendant appeals.

Denison & Curtis, of New York City (James F. Curtis and Chauncey Belknap, both of New York City, of counsel), for plaintiff in error.

Robert H. Koehler, of New York City, for defendant in error.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge (after stating the facts as above). [1] The evidence in the record indicates, as indeed it was conceded by counsel for the plaintiff, that the plaintiff defaulted in the contract in having entered the domestic market and sold the products of the de-

fendant in competition with it, and were it not for the alleged waiver thereof, as contended for by the plaintiff, this default would end the case, and the trial judge would have been obliged to dismiss or direct a verdict.

[2] It appears that after August 4, 1916, the plaintiff sold in the domestic market approximately 44,000 spark plugs. These were for export. The amended complaint pleads such sale, and further pleads a waiver of this breach of the contract. The defendant contends that at no time previous to the service of the second complaint did the plaintiff frankly admit this breach of the contract; that in view of its persistent stand that it did not breach the contract, and the denials of the charges of the defendant that the plaintiff did, whatever occurred by way of statements made by the defendant's officers, or its conduct in subsequently filling orders given to it by the plaintiff, this did not amount to a waiver, and that therefore there was no waiver of the plaintiff's breach. The defendant's letters of September 25, 1916, written to the plaintiff, were cancellations of the contract, and the second letter of that date was a direct threat not to fill any other orders unless the plaintiff could show that they were destined to foreign ports. These letters led to the Toledo conference, where a direct accusation was made against the plaintiff that it was selling in the domestic market. There was a flat denial thereof. After this conference, according to the president and vice president of the plaintiff, matters were straightened out and business relations were resumed. But there was further complaint and incrimination, which led to the conference at a hotel in New York City on November 24, 1916. It is testified that, after this conference, the sales manager of the defendant waived whatever took place up to that time, by suggesting to let bygones be bygones and continue the business relations. It does appear that orders were received after that date and deliveries were made. We think this testimony required the submission to the jury of the question of whether or not the breach on the part of the plaintiff was waived by the defendant.

[3-5] Waiver depends upon the intention of the party who is charged with the waiver. It is an intentional abandonment or relinquishment of a known right or advantage. But for such waiver, the party who enjoys it could not be released from the obligations of the contract. It is a voluntary act, and does not require or depend upon a new contract or a new consideration. Nor does it depend upon estoppel, and, once made, it cannot be recalled or expunged. Hotchkiss v. City of Binghamton, 211 N. Y. 279, 105 N. E. 410.

[6, 7] Oversight, carelessness, or thoughtlessness will not create a waiver. There must appear to be an intention to relinquish the right or advantage, and it must be proved. It may be proven by an express declaration of the party charged with the waiver. It may also be proven by the existence of acts or language so inconsistent with the purpose of the person charged to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary. If such be the facts, the question of waiver is one of law, and not of fact. It may also be proven by declarations or acts which, although denied, indicate unmis-

takably or unequivocally an intent to abandon or relinquish the breach. Under such circumstances, it is for the jury to say whether the facts, as proved, indicate that such an intention exists. It must indicate a voluntary choice not to claim the advantage of the breach. So.much depends upon the intention of the parties that, where such intent is disputed, it necessarily becomes a question for the determination of a jury. Therefore, if the established facts permit reasonable minds to differ as to the inferences or effects from them, a question of fact. arises. It is only where facts proven permit of one inference, and that a waiver, that the question becomes one of law.

[8] In the case at bar, we think that, in view of the testimony referred to, the question of waiver was a proper one for submission to the jury. The conversations which took place at the Toledo conference, as well as the New York conference, and the defendant's thereafter filling the plaintiff's orders under the terms of the contract, recognized the contract as still existing, and was some evidence of the waiver of the breach made by the plaintiff of the contract in selling in the domestic market. Shappirio v. Goldberg, 193 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798. The trial court left the question of breach of contract on the part of the defendant, as well as on the part of the plaintiff, to the jury as questions of fact. These questions have been resolved in favor of the plaintiff, and, since they have some evidence to support them, they are controlling upon us, and would require an affirmance of this judgment, except for the errors which have been assigned, and which we think were committed during the course of the trial.

[9]. The trial court refused to charge that the contract created between the parties the relationship of principal and agent for the purposes therein specified, and charged that the only relationship which existed between the parties was that of buyer and seller. The defendant requested the court to charge that "the contract on which this action is based created between the parties the relation of principal and agent for the purposes therein specified." This was refused. We think this was error. The court did charge:

"The contract on which the plaintiff is suing is a contract for purchase and sale, and not a contract of agency, and the relationship which existed between the parties was that of buyer and seller."

Under the terms of the contract, the relations of principal and agent were coexistent with that of buyer and seller. The contract had a double aspect. In one respect it created a relation of principal and agent, and in another it contemplated, as between the parties, purchases and sales. It provides that the "second party is hereby made and constituted sales agent and distributor by the first party." The term "agent" is employed. The contract called for fidelity in carrying out the terms of the contract, and it was therefore important to have the jury understand the requirement of complete fidelity, which was owing by the agent to its principal, and which the defendant had the right to expect, the violations of which might justify terminating the relationship at once. In Willcox & G. Sewing Mach. Co. v. Ewing, 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882, the first party was described as

an exclusive vendor for the sewing machines, parts, and attachments of the party of the second part within a given territory. A breach of the contract was alleged and proven on the trial of the action. The Supreme Court held that in the use of that term, and in the clause of the contract which prohibited him from soliciting trade directly or indirectly in the territory "of other agents," the relationship of principal and agent existed, requiring the fidelity which is imposed by reason of such relationship. It was said:

"So far as the company's power of revocation is concerned, the case is not materially different from what it would be if the plaintiff had agreed to sell such machines as were delivered to him at the established retail prices, receiving, as compensation for his services, the difference between those prices and the amount he agreed to pay for them under the contract of 1874. In either case, his relation to the company would be one of agency, that could be terminated at its will or by renunciation upon his part, at least after 1875. Of course, the revocation by the principal of the agent's authority could not injuriously affect existing contracts made by the latter under the power originally conferred upon him." 141 U. S. 637, 12 Sup. Ct. 97, 35 L. Ed. 882.

We think that the court erred in charging as it did and refusing to charge as requested by defendant.

[10] The court charged the jury that the contract gave the plaintiff exclusive foreign selling rights of the J–D and Ajax special brand and Lodge plugs. These were not a part of the Champion line. The court also admitted evidence that the defendant had sold these plugs for export, on the theory that such sale was a violation of the contract. We think these rulings constituted error. At the time the contract was entered into, the only spark plugs which the defendant was manufacturing and selling was the Champion line. It was subsequent to the making of the contract that the defendant became the owner of the other lines of spark plugs. It was upon the theory that, by the contract, the plaintiff obtained "exclusive and sole right to sell and distribute the products of the first party known as spark plugs," the plaintiff became the sales agent and distributor of subsequently acquired lines of spark plugs. But it will be observed that in a later paragraph of the contract the types and sizes of the plugs are specifically mentioned. No reference is made in the contract to subsequently acquired makes of spark plugs which the defendant might manufacture or control or offer for sale in the market.

Particularly is it to be noted that no reference is made to lines of the different types or trade-names than the Champion. The Champion was a registered trade-mark owned by the defendant, and its mechanical features were protected by patents. It was only through the purchase of competitors in September, 1914, that the defendant became the owner of the J–D. spark plug. After such purchase, and in placing this product upon the market, the plugs were prominently marked with the letters "J–D." Its construction was along different lines than that of the defendant's own plugs. It does appear that in order to take advantage of some feature which possessed special value by two of the J–D plugs, they were renamed "Champion sparks in water" and "Champion magneto." These were permanently incorporated in Cham-

pion lines, and were considered by the defendant to come within the plaintiff's agency, and duly recognized as such. However, the others were sold as a separate line and could hardly be said to be in competition with the Champion plugs. They were listed separately, with a mark well displayed in the circulars and upon the articles. Full opportunity was given to the plaintiff to handle these goods on the same basis as every other exporter, and the record does not disclose that any better price was offered to any other exporter. Nor is it disclosed that the plaintiff suffered a loss in its sale of the Champion plugs, due to any alleged competition of the J–D's.

Later the defendant purchased the Star Specialty Manufacturing Company, with its line of Ajax plugs. We think the same rule applied as to these plugs. They were separately marked and sold under this trade-name. The J–D Company manufactured and sold special brand plugs, which constituted a make of plugs made to order stamped with the customer's name or brand. This business was continued by the Champion Company, and evidence was permitted to show damages sustained by the plaintiff by reason of the failure to give exclusive agency for such sale to the plaintiff. We think it was error to admit this evidence, and to enhance the profits of the plaintiff by such admission. Such sales were not part of the Champion line, and were not covered by the contract between the parties.

[11] The claim of the plaintiff that sales were made by foreign shipments to the Lodge Spark & Plug Company, of England, the Fiat Company, and the Berrardo Company, and that this was a breach of the contract, was waived by the plaintiff's correspondence and its acceptance of commissions for these shipments. The proof quite conclusively establishes that commissions were paid to the plaintiff upon their demand, and were received by the plaintiff with full knowledge of all the facts. By receipt of such commissions, the plaintiff relinquished all right of action which it is claimed to have had by reason of this alleged breach of the contract. Further we believe that the shipments which were made to the Lodge Company were spark plugs which were not included in the contract between the parties, and the plaintiff was not entitled to commissions therefor.

[12] Error was also committed by the judge below in charging the jury on the question of damages for breach of contract. The jury was instructed that the plaintiff might recover, if at all, for loss of prospective retail profits of the spark plugs, because of nondelivery of the plugs ordered before the final breach. These were summarized in 13 separate claims, amounting to $270,475.15. The plaintiff was obligated to minimize the damages by buying plugs in the market and claiming the difference between the price paid and the price agreed upon. There are exceptions to this general rule, as where the injured buyer is allowed to recover special damages as resale profits, which loss he has suffered by reason of the breach on the seller's part. If there be no market value for the goods which were purchased under the terms of the contract, or which substantially answer the purpose of such goods, and the buyer suffers damages because of the failure of the seller to deliver, such damage can be recovered.

[13] If the buyer has made a contract in advance and for the resale of the goods, and that fact has been disclosed and is known to the vendor, and the latter undertakes to furnish the goods and deliver at the time specified in the contract according to the terms of the contract, so that the buyer may fulfill his contract of resale, then, if the vendor fails to deliver the property, he will be liable for damages on the basis of profits the vendee would have realized on his contract for such resale. This record, however, discloses the existence of no resale contracts having been brought to the attention of the defendant at the time of its orders.

There is some proof contained in correspondence with reference to the 100,000 plugs sold to Morris Russell, but the record discloses that 50 per cent. of these plugs so ordered were intended for stock, and as to those which were sold to Morris Russell's order it appears that there was no difference between the contract and the market price. To be entitled to resale profits, it must appear that the buyer had an existing contract for resale at the time of the purchase, and the purchase must be made for the purpose of enabling the buyer to perform the obligations of his contract of resale, and such facts must be made known, clearly, to the seller. And the theory then is that the contract by the seller has been entered into to enable the buyer to perform his obligations under the contract of resale. Setton v. Eberle-Albrecht Flour Co., 258 Fed. 965, 169 C. C. A. 625; Holloway & Bro. v. White Shoe Co., 151 Fed. 216, 80 C. C. A. 568, 10 L. R. A. (N. S.) 704. Spark plugs of other makes were obtainable in the market, which could have been purchased by the defendant, and the loss minimized, examples of which were the Mosler plug. In many instances in which orders were filled by the plaintiff, it did so by substitution of other makes. We find nothing in this record which would require us to depart from the usual rule of damages. Vulcan Iron Works Co. v. Roquemore, 175 Fed. 11, 99 C. C. A. 77; Parsons v. Sutton, 66 N. Y. 92.

[14] An item of damage claimed and proven was for alleged sales made by the defendant to the Ford Company in foreign territory, both before and after the date of the alleged breach of contract, and it was claimed that it would have resulted in profit to the plaintiff of $151,-669.18. It was contended by the plaintiff that it might be inferred that all sales made by the defendant and the Ford Company would have been made by the plaintiff, except for the breach of contract. There was no proof, however, to show that the plaintiff had lost any orders by reason of such sale. We think this evidence was inadmissible, and was not an element of damages which the jury might consider. The selling and distribution of the spark plugs was the obligation of the plaintiff under the terms of the contract, and, in the absence of some proof showing that the defendant interfered with or sold to the customers of the plaintiff, proof of this character was inadmissible and was prejudicial to the defendant.

It would be against the most elementary rules in respect of damages for breach of contract to allow the plaintiff the profits of a sale which he did not make, and which there is no reason to believe he would have made. The plaintiff, if it made out its right to recover, was en-

titled to any actual damages sustained by reason of its being obliged to purchase spark plugs in the market at the market value and at a price above the contract price, thus resulting in loss to the plaintiff. Cincinnati, etc., Gas Co. v. Western, etc., Co., 152 U. S. 200, 14 Sup. Ct. 523, 38 L. Ed. 411.

[15] The trial court, as an element of damages, permitted the plaintiff to offer proof as to estimates of profits it would have made if the contract had continued to be performed down to the date of its termination, July 15, 1918. In estimating what this loss sustained would be, due regard must be had for cost of carrying on the business of the plaintiff, its cost of selling. This is a subject which should be a matter of proof, and not an estimated loss of profits. Damages for the interruption or destruction of established business may be recovered; but the plaintiff must do so by establishing, with reasonable certainty and by competent proof, what the amount of his loss actually was. This character of proof was not offered.

For the errors assigned, the judgment below is reversed.