**PHILIPS et al. v. UNITED STATES.**

**UNITED STATES v. STEPHENS et al.**

Nos. 5238, 5239.

Court of Appeals of the District of Columbia.

Argued Jan. 12, 1932.

Decided June 6, 1932.

**882**

Leo A. Rover, W. S. Ward, Marcus Borchardt, and Charles B. Rugg, all of Washington, D. C., for appellee in No. 5238 and for appellant in No. 5239.

George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., Edmund Brady, Henry R. Gower, Chas. A. Douglas, Thos. C. Bradley, Abner H. Ferguson, and Jo. V. Morgan, all of Washington, D. C., for appellant in No. 5238 and for appellee in No. 5239.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

## VAN ORSDEL, Associate Justice.

As a result of vast purchases made by the government during the World War there was a large accumulation of surplus materials at the time of the signing of the armistice, among which was the item involved in this suit, 188,902,787 feet of lumber scattered at various points throughout the country. It was realized by both the government and the trade that to dump this vast quantity of materials upon the market at once would cause serious injury to business throughout the country. Consequently, a policy was adopted of disposing of this material on a graduated scale running over sufficient period of time that a glut in the market might be obviated.

Coming to the consideration of case No. 5238, after conferences and negotiations between John L. Philips, Richard L. Humphrey, of the War Industries Board, and a number of representatives of various lumber dealers' associations throughout the country, a contract was entered into between the United States and "J. L. Philips and John Stevens, of Jacksonville, Florida, the duly authorized representatives of the National Bureau of Wholesale Lumber Distributors, the National Retail Lumber Dealers Association, West Coast Lumber Association, the Central Pennsylvania Lumber Company, the Southern Pine Association, the Georgia-Florida Saw Mill Association, and the North Carolina Pine Association."

By the terms of this contract the United States agreed to sell and deliver to the purchaser the lumber in question in lots of not less than 1,000,000 feet, the purchaser to receive and pay for the same under terms and conditions specified in the contract. It provided that the description and location of lumber in lots exceeding 1,000,000 feet should be set forth in an inventory attached to the contract. It then provided in article II that the contracting officer may furnish the purchaser additional inventories for lumber in lots of less than 2,000,000 feet on or before May 1, 1919; and on or before August 1, 1919, additional inventories for surplus lumber in lots exceeding 2,000,000 feet may be furnished by the contracting officer to the purchaser, who reserved the right to refuse to purchase such lumber upon giving written notice of his refusal.

Provision was made in the contract for the inspection and classification of the quality, size, and quantity of the lumber at the various locations designated in the inventories at the time of loading by a representative of the United States, and a representative of the purchaser, and a third person in the event that these two failed to agree.

Article V of the contract provides that "base prices shall be fixed for the various species, sizes, and grades of lumber at each location designated in Schedule A, on the first day of February, 1919, and on the first day of each succeeding month during the currency of this contract. * * * Base pric-

es shall be determined by a duly qualified representative of the contracting officer and a duly qualified representative of the purchaser, or, in event of failure to agree, by a third person selected by these two, whose decision shall be final and binding upon both parties."

Provision was made for payment by the United States of the expense of yardage, handling, and loading, the United States assuming the responsibility of promptly loading the lumber on cars furnished by it with the provision that the title to the lumber should pass on loading, and no further responsibility should attach to the United States. Shipping instructions were to be given by the purchaser for all lumber in lots of less than 2,000,000 feet before May 1st, and for lumber in lots exceeding 2,000,000 feet before August 1st.

The contract further provided that the prices of the lumber should be calculated by the government on the following basis: "(1) Deduct from the base price fixed in accordance with the provisions of Article V, or, the location from which any lot of lumber is shipped, 12% thereof. (2) If the invoice price at which any lot of the lumber is shipped by the purchaser less the freight exceeds the base price for the location from which said lumber is shipped, deduct from said invoice price the actual freight paid for the lumber from the point of loading to the point of destination, and from the result so determined the sum of 12% thereof."

The contract provided that the purchaser should furnish a bond in the sum of $500,000 for the "full and faithful performance by the purchaser of all terms, covenants, and conditions of this contract on the part of the purchaser to be performed." The purchaser was required by the contract to furnish statements and reports to the government. The bond was furnished by the Fidelity & Deposit Company of Maryland. The war department appointed as its agent George M. Chambers to inspect the lumber and fix the base prices, as provided in the contract. Chambers acted as such agent in conjunction with Philips without intervention of a third party.

The defendants Philips and Stevens entered into an agreement between themselves providing for a joint interest in the undertaking, with Philips as the directing head to take charge of all field work including the sale and shipping of the lumber, and that his reports of expenditures, etc., should be acceptable to both parties. Stevens was to have charge of the office and clerical part of the organization, and any profit or loss should be divided equally between them.

The court below, in its opinion, found as follows: "In making sales of this lumber, invoices were sent to the Government for each sale and of the amount of the invoice twelve per cent was deposited in the bank to the credit of Philips and Stevens, and the remaining eighty-eight per cent to the joint credit of Philips and Stevens and the defendant bonding company, and upon the latter account checks were drawn from time to time payable to the proper accounting officer of the United States. It appears, however, that the amount shown by the invoices was in most cases, and probably in nearly all cases, not the price at which the purchaser from Philips and Stevens bought the lumber, but merely the base price fixed by Philips and Chambers, and that above the invoice price the defendant Philips secretly received large sums from the purchasers from Philips and Stevens, that these sums were frequently paid in cash and not by check. In addition to this method of receiving profits, defendant Philips in some instances became a secret partner of the purchasers of this lumber."

The court below further found, and the evidence unquestionably sustains the finding, that Philips, the active contractor with the government, and Chambers, the direct representative of the government, fixed the base prices of all the lumber disposed of, and that they made large profits on the lumber sold. The secrecy of these transactions and the fraudulent means used to deceive the government began almost immediately after the execution of the contract, and extended throughout the life of the contract. This was convincing proof of a corrupt agreement between Philips and Chambers to so fix the base prices as to enable Philips to make the secret profits. The fraud extended in many instances to the purchasers of the lumber on the base prices fixed, through a corrupt agreement between the purchaser and Philips that, in consideration of the sale to them at the base price, an agreed compensation should be paid to Philips.

Only the defendants Philips, the executors of Chambers, Frank T. Sullivan, and the Fidelity & Deposit Company of Maryland, have appealed. Sullivan was a purchaser of large quantities of lumber, and the evidence as to the fraudulent collusion between him and Philips furnishes satisfactory ground for the decree of the court below. As to the defendants here, the court entered a judgment against defendant Philips in the sum of $1,-

381,447.00, with interest from June 3, 1917, until paid. Judgment was entered against the defendant Sullivan, holding him jointly and severally liable with Philips for such amounts and interest thereon included in the judgment of $1,381,447.00 against Philips as represented the net profits realized by Sullivan, which were found to amount to the sum of $947,610.73 with interest thereon from June 3, 1927, until paid. The defendants Merchants & Manufacturers. National Bank of Newark, N. J., and Nellie Senft Chambers, as executors of George M. Chambers, deceased, were adjudged jointly and severally liable with Philips for such amounts and interest thereon in the judgment against Philips as represented the net profits realized by Chambers from these transactions in the amount of $26,088.94 with interest thereon from June 3, 1927. Judgment was decreed against the Fidelity & Deposit Company of Maryland for $500,000, the full penal amount of the bond.

It is contended by counsel for the appellants that the contract between Philips and Stevens and the government is a sales contract and not a contract of agency. It is true the contract contains phraseology ordinarily found in a contract of purchase and sale, and, if the use by the contracting parties of the terms "purchase" and "sale" is to be regarded as the sole measure or test of interpretation, the conclusion we have reached would be more difficult to sustain; but in our opinion the obvious inartificial use of these terms is wholly out of harmony with the more vital provisions of the instrument, and, therefore, should be given very little effect in the effort to ascertain the real purpose and intent of the contract.

In the case of Heryford v. Davis, 102 U. S. 235, 243, 26 L. Ed. 160, the Supreme Court, holding an instrument calling itself a contract of "hire," and in which the terms "hire" and "loan" were used, to be in legal effect a contract of sale, said: "What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account. Though the contract industriously and repeatedly spoke of loaning the cars to the railroad company for hire, for four months, and deliver-

ing them for use for hire, it is manifest that no mere bailment for hire was intended."

An examination of the provisions of the contract and the circumstances under which it was made in our opinion reveals a contract of agency and not of sale. It clearly was not the intention of the parties that there should be any delivery of the lumber to Philips and Stevens for their own account, and equally it is clear, we think, that it was not intended that Philips and Stevens should purchase the lumber for their own account. Certainly there was no fixed price in the contract or fixed amount of lumber that Philips and Stevens were to purchase. Read as a whole, we think the contract contemplated, and the parties themselves so understood and dealt with relation to it, that Philips and Stevens were to sell the lumber which they received under the contract measured by the amount involved in the particular sale. They were to give shipping instructions to the United States for the lumber so sold. The United States was obligated to load the lumber in accordance with the shipping instructions given by Philips and Stevens, and the title was retained in the United States until the lumber was loaded and shipped. The United States reserved under the contract its right to withdraw from the contract for its own use any portion of the lumber at any time prior to its sale by Philips and Stevens. When sales were so made and the lumber shipped, the price at which it could be sold might be for more, but in no event less, than the base price fixed by Philips and Chambers, less a commission of 12 per cent. in either case. On this basis each sale was to be accounted for to the United States. This represented the amount which the United States was to receive for the lumber under the contract, and this amounted to a sale by the United States to the purchaser of the lumber through the agency of Philips and Stevens, with an agency commission of 12 per cent. to them.

There was nothing in the conferences held leading up to the execution of the contract or in the contract itself which either impliedly or expressly discloses any intention to transfer to Philips and Stevens absolute property in the lumber, and in this respect it lacks the essential characteristic of a sale or a contract of sale. As suggested, title would not pass until the lumber was loaded, and it was not to be loaded until it had been sold through the agency of Philips and Stevens, and until they had furnished instructions to the United States to ship it to the purchaser

in accordance with such sale. And, if the sale price was in excess of the base price, the United States rather than Philips and Stevens was to benefit to the extent of the excess over and above the commission. It follows, we think, that there is nothing in this contract that discloses any intention to vest ownership and dominion over the lumber in Philips and Stevens, but rather the intention to clothe them with the authority of an agent to sell, which, of course, involves the duty of accounting.

While it is true that an agent, making a sale on behalf of his principal, ordinarily incurs no liability for the price at which the goods are sold, and the principal must look to the buyer for payment, this rule involves exceptions and may be enlarged without changing the essential nature of the relationship. Sturm v. Boker, 150 U. S. 312, 330, 14 S. Ct. 99, 37 L. Ed. 1093; In re Galt (C. C. A.) 120 F. 64, 69. The exception is particularly applicable to the present case in that all lumber was to be sold on delivery at the loading station, hence the principal, the government, was not required to look beyond the point where it parted with title to require payment of the purchase price. Nor is the stipulation in the contract requiring Philips and Stevens to collect the purchase price and account for it to the government an uncommon obligation of agency. Their reward for this risk was the generous commission which they were to receive. In re Flanders (C. C. A.) 134 F. 560, 562. Butler Bros. Shoe Company v. United States Rubber Company (C. C. A.) 156 F. 1.

In the last analysis, however, whether the contract in the instant case be called a contract of sale or a contract of agency is of little importance. It was that sort of contract which created a fiduciary relation between Philips and Stevens and the government of the United States. Under its terms Philips and Stevens were required to sell the lumber and account to the United States for the proceeds of the sale. They were obligated to sell it for the best price obtainable, and to honestly account for the proceeds. Philips, by collecting secret profits in the sale of the lumber, and by fraudulent collusion with the agent of the government in fixing the base prices at which the lumber should be sold, and by fraudulent collusion with the purchasers of the lumber from whom he received secret profits, perpetrated frauds against the United States for which he is liable in an accounting, whether this contract under its peculiar terms be called one of sale or one of

agency. Valdes v. Larrinaga, 233 U. S. 705, 34 S. Ct. 750, 58 L. Ed. 1163; Willcox & Gibbs Sewing-Machine Company v. Ewing, 141 U. S. 627, 12 S. Ct. 94, 35 L. Ed. 882; Champion Spark Plug Company v. Automobile Sundries Company (C. C. A.) 273 F. 74, 80.

It is earnestly contended that the surety company has been released from liability on its bond through the action of Philips and Stevens and the agent of the government in extending the negotiations under the contract beyond August 1, 1919. In other words it is insisted that the contract terminated on that date, and that the transactions subsequent to that date operated to extend the contract without the consent of the surety company thereby releasing it from liability.

The provision in article II of the contract that the contracting officer might furnish the purchaser additional inventories for lumber in lots less than 2,000,000 feet prior to May 1, 1919, and additional inventories for surplus lumber in lots exceeding 2,000,000 feet prior to August 1, 1919, was merely a limitation as to the time within which these particular conditions of the contract should be carried out, and the time when shipping instructions under article IV could be given by Philips and Stevens to the United States, requiring the United States to promptly load the lumber on cars furnished by it.

The further provision in article IV that the title to lumber shall pass on loading and no further responsibility shall attach to the United States, applied not alone to the inventories specified but to any additional inventories that might be furnished under the provisions of article V of the contract, or that might be returned where the government had acted under article VII of the contract and reserved the lumber embraced in the contract for its own use prior to the sale thereof by Philips and Stevens. This right to reserve implies the right to release within time limited.

The contract further provides in article VI that the contract price of the lumber sold shall be paid by the purchaser to the United States within ninety days from the date of loading the lumber. This clearly extended the contract beyond the shipping period mentioned in article IV. There is nothing in the provisions of the contract even tending to indicate that it was contemplated by the parties that the contract should terminate on the first of August, 1919. Its provisions, we think, clearly indicate that the contract should continue in force until all the transac-

tions had under it were closed and completed. Certainly there was no such express provision as to the date of the termination of the contract as would mislead the surety company in this particular.

■ It appears that, shortly after the contract was signed, the government, availing itself of the right reserved under article VII, withdrew a large amount of lumber from the terms of the contract which was embraced in the schedule thereto attached without notice to Philips and Stevens. When Philips and Stevens discovered this they notified the government that they had sold a large part of the lumber so withdrawn to one Sullivan setting forth that they would be heavily damaged if they were unable to carry out their contract with Sullivan, whereupon the proper officer of the government entered into an arrangement with Philips and Stevens to the effect that a portion of the lumber withdrawn should be restored provided that the government would be released from all liability for damages growing out of the transaction. This arrangement was carried out, and it is contended that the surety company, having no notice of these transactions and not having assented thereto, is released from all liability under its bond. As to this contention, we are of the opinion that the negotiations referred to were within a reasonable construction of the provisions of the contract.

The contract provided that the contracting officer might furnish the purchaser from time to time additional inventories for surplus lumber, with the privilege to the purchaser to refuse to accept it, but when accepted, the base prices were to be forthwith fixed upon the inventories at the location of the lumber. This clearly contemplated the right on the part of the government to return lumber that had been withdrawn from the contract for the use of the government, and, if accepted by the purchaser, it would come clearly within the provisions of the contract. It logically follows, we think, that the transaction between Philips and Stevens and Sullivan on the one hand and the government on the other was within the provisions of the contract of which the surety company had full notice, and by the provisions of which it became bound. This, therefore, would not constitute in our opinion such a change in the terms of the contract as would operate to relieve the surety company.

■ Article XIII provides for adjustment of claims and disputes as to the performance or nonperformance of the conditions of the contract by reference to the Secretary of War, whose decision "shall be final and conclusive on all matters submitted for determination." This provision of the contract contemplated the possibility of disputes arising from differences of opinion as to the terms and provisions of the contract. This was likewise notice to the surety company not only that questions might possibly arise involving the construction of the contract, but also to the provision made in the contract itself for their adjustment.

■ We are not impressed with the argument of counsel for the surety company that it had no knowledge of the negotiations preliminary to, and contemporaneous with, the execution of the contract, and no knowledge of the construction that was subsequently placed upon it. While the evidence may not disclose that the surety company had knowledge of the conferences preceding the execution of the contract, the recitals in the contract were such as to put it upon inquiry as to the circumstances under which the agreement culminating in the contract was made. Any such inquiry would have led to the conferences that were held prior to the making of the contract. The surety company, however, did have full knowledge of the construction placed upon the contract by the parties and of the manner and details in which the contract was being carried out. The cashier of Philips and Stevens was placed in that office by the bonding company "to look out for their interests." All copies of invoices and settlement sheets and countersigned checks to the government in settlement of those invoices were furnished by Philips and Stevens to the surety company. It was, therefore, charged with knowledge of the way in which the parties themselves construed the contract, and also with the fair intent of the contract which appears upon its face, and is supported by the record of the conferences and the construction of the parties as evidenced by the procedure adopted in carrying it into effect. It was likewise charged with full knowledge of the fact that both parties understood the contract to be one of agency and had so dealt with relation to it in all respects, except in the concealment by Philips and Stevens of the corrupt agreement with Chambers.

As we have already suggested, the contract taken as a whole was reasonably susceptible of no other interpretation, and this conclusion is strengthened by reference to the negotiations which preceded it. We have, therefore, not only a case in which, by the terms of the contract itself, Philips and Stevens were bound as agents, but a case also

in which they themselves and the other party, the government, so understood and acted upon it, and further a case in which the bonding company with knowledge of all this stood by without complaint. Under these circumstances we cannot accept the views so strongly urged that it should not be required to meet its obligations.

Coming now to case No. 5239, in which the United States appealed from that portion of the decree of the court below relieving the defendant John Stevens from all liability resulting from the fraud of the defendant Philips, the record discloses that Philips and Stevens entered into an agreement which we think can be interpreted as a partnership for the purpose of entering into and carrying out "Sales contract No. 1." Philips, under the agreement, was to be the directing head of the organization. In other words, the field man to carry on the negotiations respecting the sale of the lumber in question. Stevens was to be the office man and conduct the affairs of the partnership at the office end. There was no evidence to show that Stevens participated in the secret profits with Philips or with any one else or that he had any knowledge of the fraudulent transactions of Philips.

The theory upon which the court below distinguished between the liability of Philips and Stevens was based upon the liability of Philips for the frauds perpetrated, and as Stevens did not participate in the frauds his liability would only arise through breach of contract. We are not impressed with this conclusion. The liability of both Philips and Stevens is based upon the contract, and the suit is for a violation of the government's rights under that contract. Indeed, the suit is for a breach of the contract, and the fraud alleged and proved is material as showing and establishing that fact. In the last analysis the question is whether Stevens is liable for Philips' breach, which in law is the breach of both.

The agreement between Stevens and Philips was in the nature of a partnership agreement. It provided for an apportionment of the work, a division of the profits, and a common undertaking. These constitute the elements of a partnership. Ward v. Thompson, 22 How. 330, 334, 16 L. Ed. 249. Each of the partners was not only an agent for the partnership but an agent for the other partner. They were, therefore, liable for the default or fraud of each within the scope of the common undertaking. Castle v. Bullard, 23 How. 172, 16 L. Ed. 424; McIntyre

v. Kavanaugh, 242 U. S. 138, 37 S. Ct. 38, 61 L. Ed. 205; Strang v. Bradner, 114 U. S. 555, 561, 5 S. Ct. 1038, 29 L. Ed. 248; James-Dickinson Co. v. Harry, 273 U. S. 119, 122, 123, 47 S. Ct. 308, 71 L. Ed. 569; National Savings & Trust Company v. Sands, 44 App. D. C. 20.

It follows, therefore, that, Philips having been held liable to the United States for the profits realized under this contract which accrued to him in fraud of the rights of the United States, Stevens' liability as a partner follows as a matter of law by reason of the joint responsibility which he assumed with Philips under the contract.

The decree as to No. 5238 is affirmed, with costs, and the decree as to No. 5239 is reversed, with costs.