## MATHEWS CONVEYER CO. v. PALMER-BEE CO.

### No. 9218.

Circuit Court of Appeals, Sixth Circuit.

April 9, 1943.

Harold Olsen, of Chicago, Ill. (Harold Olsen, of Chicago, Ill., and Whittemore, Hulbert & Belknap and Clarence B. Zewadski, all of Detroit, Mich., on the brief), for appellant.

I. Joseph Farley, of Detroit, Mich. (I. Joseph Farley and Donald N. Sweeny, both of Detroit, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The Mathews Conveyer Company brought suit against the Palmer-Bee Company, claiming breach of an agency agreement and asking for an accounting from its alleged agent. The complaint further charged that the Palmer-Bee Company was guilty of unfair competition, infringement of copyright, and patent infringement, for which the conveyer company asked damages and injunctive relief. For convenience and clarity, the parties will be hereinafter referred to as plaintiff and defendant, the capacities in which they appeared on the trial of the case. The district court dismissed the complaint, holding that the agreement in question was one of sale rather than agency, and that the plaintiff was not entitled to an accounting; that defend-

ant was not guilty of unfair competition or infringement of copyright; and that the patents sued upon were void.

Plaintiff is a manufacturer of industrial machinery and equipment, one of its principal products being conveyer machinery for industrial plants. Defendant is, likewise, a manufacturer, and an erector of like products. The agency action arises out of a sale and installation of such machinery, referred to by the parties as the "Chevrolet sale." Plaintiff contends that defendant breached its agency agreement by installing its own machinery in this transaction; that defendant was bound to use its best efforts to promote the sale of plaintiff's product and not to sell any other kind of gravity conveyer machinery; and that it is entitled to an accounting for the profits which it would have secured if its own machinery had been installed instead of that of defendant.

The alleged agreement of agency upon which plaintiff relies is in the form of a letter written by the president of defendant company to plaintiff, confirming prior oral conversations on the matter. Inasmuch as the determination of this issue depends to a large extent upon the terms of the agreement, it is necessary to recite the substance of the stipulations therein contained. The letter set forth that it was the understanding of the parties that defendant was appointed the exclusive sales agent and representative of the plaintiff for the State of Michigan; and that plaintiff would furnish defendant with catalogues and printed matter, which were to bear the impress of the defendant, to assist in the promotion of sales, would furnish engineering data sheets and engineering assistance, and would refer all inquiries from the Michigan territory to defendant. It was further stated that sale of plaintiff's products to defendant would be at prices subject to changes of market conditions, but at no time would exceed the lowest net cost to any other of plaintiff's agents; and it was required that defendant devote its best efforts to the sale of plaintiff's products, keeping plaintiff fully advised as to the progress of the sales department on the more important prospects, and rendering plaintiff, if desired, monthly statements of sales, giving names of purchasers, locations, and list of materials purchased. Defendant also agreed not to sell any other make of gravity conveyer. Prices to defendant were to be subject to market conditions, and terms of payment, 30 days net, 2% cash discount, payable the 10th of the month following purchase. It was also stated that the agreement could be canceled by either party on 60-days' notice in writing.

While the foregoing constitutes the written agreement under which the parties proceeded, the evidence of their dealings disclosed additional understandings; and the parties have assumed that their further agreements and conduct thereunder are to be considered as part of their contract It appears, then, that during the course of their dealings, defendant received from plaintiff a commission on sales made of plaintiff's products and sold the products at prices established by the plaintiff, departing from them only upon plaintiff's approval and at defendant's request. Defendant was permitted to grant a discount to customers not exceeding 10% off plaintiff's list price; and whenever it was necessary to grant a larger discount in order to secure the business, defendant's commission was reduced. The defendant dealt directly with its own customers in securing orders and in delivering and installing the products of the plaintiff. It purchased the products outright from the plaintiff and paid the plaintiff directly for them. Furthermore, defendant billed customers directly in its own name, assumed credit risks for the goods, and obtained full title to the goods by purchase from the plaintiff, exercising complete control therein, including all liability incidental to the installation and erection thereof. The name of the plaintiff appeared in the Detroit telephone directory under the same address and with the same telephone number as defendant's, and inquiries from the public, made direct to plaintiff, were referred to defendant. Defendant kept no stock of plaintiff's product in the state of Michigan and all goods sold to defendant were manufactured by plaintiff and loaded upon cars f.o.b. plaintiff's plant. in Pennsylvania.

Agency Agreement

Whether the agreement between the parties and their subsequent understandings and dealings constitute a contract of agency, or sale, is the issue to be determined on this phase of the case.

At the outset, it may be remarked that the word "agency" is frequently used to indicate that a dealer has the exclusive right to sell a specified article in certain territory; but such dealer does not thereby

represent the manufacturer as agent in the sense in which that relation is understood in the law of principal and agent, but simply buys from the manufacturer in the regular course of trade and sells the article to the public. Such a transaction is a sale rather than an agency. See Poirier Mfg. Co. v. Kitts, 18 N.D. 556, 120 N.W. 558. In W. T. Rawleigh Co. v. Trerice et al., 224 Mich. 420, 195 N.W. 79, where a contract provided that a defendant in Michigan purchase goods from a foreign corporation f.o.b. in Illinois, and that he give his entire time to the sale of such products in Michigan, make a detailed weekly report to plaintiff, and sell only in a certain locality determined by plaintiff, it was held that the contract was one of sale, the court observing that the business so conducted was the defendant's business and not that of plaintiff.

To establish its claim that the contract was one of agency, plaintiff relies on Willcox & Gibbs Sewing Machine Co. v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882; and to sustain the contrary view, defendant relies on Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653. Oddly enough, counsel for neither party attempts to distinguish or even comment upon the authority cited by the other. But the determination of this controversy requires some discussion of both of the cited cases.

In Willcox & Gibbs Sewing Machine Co. v. Ewing, supra [141 U.S. 627, 12 S.Ct. 95, 35 L.Ed. 882], defendant company had appointed plaintiff as its "exclusive vendor" in a defined territory, and had agreed to sell him its machines at a large discount from its retail New York prices. It further agreed that it would not knowingly supply its goods at a discount to go within that territory. The plaintiff accepted the appointment and agreed to pay for the machines at the discount rate; not to sell them below the retail rate; and not to solicit orders in the territory of other agents. It was further agreed that plaintiff's time, attention, and abilities "must primarily be devoted to the forwarding of the interest" of defendant, and that the "appointment or agency" was not saleable or transferable by plaintiff without defendant's consent. When defendant discharged plaintiff and terminated the contract, plaintiff sued for breach of a sales agreement. The court held that the contract was one of agency and that, inasmuch as plaintiff had

the right to terminate it on reasonable notice, the defendant had the same right in default of stipulations to the contrary.

In its holding the court stated that plaintiff was "none the less an agent because of his appointment as 'exclusive vendor' * * * or because of the peculiar privileges granted to or the peculiar restrictions imposed upon him," and emphasized that he was prohibited from soliciting trade from the territory of "other agents"; that he had agreed to bind "all subvendors or agents" to sustain the established retail prices of the company; and that there were provisions of restrictions upon the sale of his "appointment or agency." "The agreement constituted him the sole agent of the company for the sale of its machines within a certain territory. It is true that the machines he undertook to sell were to be purchased by him from the company at a large discount. But he could not sell them by retail below the regular retail prices. This arrangement was the mode adopted to protect the company's interest, and to secure the plaintiff such compensation for his services as would induce him to devote his time, attention, and abilities to the company's interests. He was still a mere agent to sell such machines as might be delivered to him under the contract." (page 636, of 141 U.S., page 97 of 12 S.Ct., 35 L.Ed. 882.)

The court, in its determination of the case, did not remark upon the fact that the contract in question was preceded by another contract, which recited that the company's agency had been conducted by plaintiff, and that a settlement of accounts had been made, whereby the assets of the agency had been transferred to him—although the court recited these and following circumstances in its statement of facts preceding its opinion. In such prior contract, plaintiff had agreed to continue the business then established "and, in good faith, to devote his entire time and energy to its advancement and improvement, and to the increase of the sale of the machines, as fully and energetically as he had done the previous year; and so long as he faithfully did so, and in good faith kept at least the sum of $25,000 actively employed therein, the company 'agreed to continue, and in equal good faith carry out all the provisions' of the agreement." (page 628 of 141 U.S., page 95 of 12 S.Ct., 35 L.Ed. 882.) In this prior contract, the company also agreed to convey to plaintiff the lease of the property in which the business was then car-

ried on, to be used for the purposes stated in that contract; and "that 'the agency, or, in other words, the interest in the Willcox & Gibbs sewing-machine business' conveyed to" defendant, was not to be sold or assigned by him without the company's consent. (page 629 of 141 U.S., page 95 of 12 S.Ct., 35 L.Ed. 882.)

Whether the foregoing provisions, all of which were recited in the court's statement of facts, were of weight in its determination that the contract was one of agency, must be left to surmise; but it may be reasonable to suppose that, in arriving at its conclusion, their consideration, though unexpressed, was implicit in its decision. It may be remarked that in the First Circuit, Judge Anderson, in a dissenting opinion, observed, in support of his view, that the relations between the parties in the case then before the court, "were more like those frequently *(perhaps inaccurately)* described as the relations of principal and agent, rather than those of vendor and vendee,"—and cited the Willcox case. G. Angelo & Co. v. Commissioner of Internal Revenue, 1 Cir., 36 F.2d 193, 195. That the contract in the Willcox case differs in certain particulars, perhaps important, from the contract in the instant case, appears from the fact that there the alleged agent purchased an agency from the company and agreed, in the first contract, to devote his entire time to its business, and in the subsequent agreement, to devote his attention and abilities primarily to the forwarding of the interests of the company. Whether these considerations are of importance, it appears that subsequent adjudications are applicable in the determination of the issue here raised.

We come, then, to the principal authority on which defendant relies in its contention that the contract was one of sale; and discussion of the three opinions—in the District Court, Circuit Court of Appeals, and the Supreme Court—seems merited. In Standard Fashion Co. v. Magrane-Houston Co., D.C.Mass., 254 F. 493, 496, plaintiff brought a bill against defendant, setting forth that by virtue of an agency agreement, defendant was bound to sell only plaintiff's patterns; that defendant was guilty of violation of the contract in selling patterns of other companies; and that plaintiff was entitled to an injunction to restrain such sales. Defendant answered that the contract in question was one of sale and that because of covenants providing that it could not sell or permit to be sold on its premises any other pattern, the agreement was in violation of the Clayton Act, 15 U.S.C.A. § 14.

According to the terms of the contract, plaintiff agreed to grant an agency for the sale of patterns to defendant and agreed to sell the patterns at a discount of 50% from retail prices, f.o.b. New York, together with advertising matter, on specified conditions and prices. Furthermore, plaintiff allowed defendant to return discarded patterns, on certain conditions, for other patterns, provided such patterns had been purchased directly from plaintiff. The defendant agreed to purchase a certain number of fashion sheets and catalogues; to pay transportation charges; to buy and keep on hand, $1,000 in value of patterns, at net invoice prices; and to pay plaintiff, for the first order, $500, 30 days after shipment. Defendant also stipulated not to sell or permit to be sold on its premises, during the term of the contract, any other make of pattern, and not to sell the patterns except at label prices.

In determining whether the contract created an agency, or resulted in a sale, the court referred to the reports of the Judiciary Committees of the House of Representatives and the Senate, accompanying the Clayton Act, which stated that the Act did not prohibit or forbid exclusive agencies, "but on the contrary it in no way whatsoever relates to agencies, properly so termed." The court held that the contract did not establish an agency " 'properly so termed,' although it is made to assume this aspect in some of its features,"—but that it was a contract for sale, and in passing upon the question said: "Counsel for the plaintiff relies upon Willcox & Gibbs Co. v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882, as decisive of the question whether the contract was one of agency or one for sale; but admitting under the authority of this case that the defendant was created an agent for certain purposes, it is also nevertheless true that the contract contained an agreement for an absolute sale of patterns and the plaintiff's publications to the defendant as its agent."

On appeal [1 Cir., 259 F. 793, 794], the Circuit Court of Appeals affirmed the holding of the district court on this point, in the following language:

"We also agree with the District Court that the contract does not establish an agency 'properly so termed,' but that it is

a contract for sale. The case is easily distinguishable in this regard from Willcox & Gibbs Co. v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882. Full title passed from the plaintiff to the defendant. The defendant was selling its own goods to its own customers; it was not, under delegated authority, selling plaintiff's goods to the plaintiff's customers.

\* \* \* \* \* \* \*

"An agency is not created simply by calling a contract for sales an agency contract.

"We may test the question whether the defendant was the plaintiff's agent engaged in selling the plaintiff's goods, or a vendee selling its own goods, by querying whether the plaintiff could be held liable in tort for the defendant's material and false misrepresentations made to a customer—such misrepresentations, for instance, as that patterns sold embodied the latest Paris fashion when in fact they were obsolete. Obviously, if the defendant was the plaintiff's agent, its misrepresentations, made in the course of the business of the agency, would bind the plaintiff. We think the plaintiff would be surprised to find this or any other court holding it responsible for such tortious conduct of the defendant with relation to the sale of these patterns."

On appeal to the Supreme Court, it was held that the contract was one of sale and, in determining this issue, the court said:

"It is insisted by the petitioner that the contract is not one of sale, but is one of agency or joint venture; but an analysis of the contract shows that a sale was in fact intended and made. \* \* \*

"Full title and dominion passed to the buyer. While this contract is denominated one of agency, it is perfectly apparent that it is one of sale." Standard Fashion Company v. Magrane-Houston Company, 258 U. S. 346, 354, 42 S.Ct. 360, 361, 66 L.Ed. 653.

In the foregoing case we have, then, a contract similar in many important respects to the agreement in the present controversy. Both contracts referred, in their terms, to the relation between the parties as one of agency; both provided that the alleged agent would sell plaintiff's products only, and would not sell them below a stated price. In each contract it was agreed that the alleged agent would purchase the products outright from the plaintiff; and no condition was to be performed by the defendant before title to the property so purchased would vest in it. On the trial of the cited case, and on the trial of the in-

stant case, plaintiffs claimed that the contracts were agency contracts; and the defenses were that they were agreements of sale. In one, the plaintiff asked for an injunction; in the other, plaintiff asked for an accounting. The trial courts held that the agreements were not those of agency, but of sale; and although there was an aspect of agency in both agreements, the sales nature of the contract was controlling—in the cited case, to bring it within the provisions of the Clayton Act, prohibiting price fixing and agreements of purchasers not to deal in goods of competitors under given circumstances—and in the instant case, to deny an agency accounting.

To like effect is the decision in the case of Standard Fashion Co. v. Cummings, 187 Mich. 196, 153 N.W. 814, 817, L.R.A.1916F, 329, Ann.Cas.1916E, 413, referred to by the trial court in its findings, where the Supreme Court of Michigan had occasion to pass upon the same contract as that involved in the Magrane-Houston case, supra. Plaintiff had sued in assumpsit for a balance due on the goods sold. Defendant contended that the transaction was not a sale but an agency agreement; and that, therefore, plaintiff had been carrying on intrastate business in violation of the State statute requiring a foreign corporation so engaged to file its articles of association in the office of the Secretary of State under penalty providing that, otherwise, it could not maintain any action in the State under any contract made by it. The court held that while the agreement purported to be an appointment of an agent, nevertheless, the transaction under the contract amounted to a sale; that "when these articles of merchandise were delivered to Cummings they became his property, and the sales were made on his own account, and not on account of the plaintiff." While the adjudications of federal courts control on the question of what is interstate commerce, necessarily including the determination of what constitutes "doing business" in a state, the above Michigan authority is in apposition with the federal cases heretofore discussed.

With regard to the case of Philips et al. v. United States, 61 App.D.C. 206, 59 F.2d 881, relied upon by plaintiff, it appears that there defendants entered into a contract for the purpose of disposing of lumber for the Government. The court found that although the contract was called a sale, the purchasers did not really buy for their ac-

count; and that there was no intention to vest them with any title or ownership, but merely to clothe them with the authority of an agent, subject to account. Under these circumstances, the authority is obviously inapplicable to the case before us.

From a consideration of the evidence and a review of the foregoing cases, we arrive at the conclusion that the contract was one of sale and not of agency. The products were bought outright from plaintiff by defendant. The latter dealt directly with its own customers in securing orders, and in delivering and installing the equipment. It billed such customers in its own name, assumed all credit risks for payment, and, having obtained full title to the goods, exercised complete control over them, including installation and erection, as well as assuming all liability incidental thereto. It engaged on its own behalf in procuring business for plaintiff's products and carried on its own business for itself, and not for plaintiff.

While the agreement that defendant was to devote its best efforts to the sale of plaintiff's products may seem like an obligation of agency, there is no reason why a manufacturer may not require of all persons to whom it sells its goods, to do all that they lawfully can to make sales, to promote its interests. This does not necessarily show a relationship of agency; nor is the fact that the parties made use of the word "commissions" controlling. For this was merely a way of adding a profit to the buyer, who sold to the public, and was an added incentive for defendant to sell more of plaintiff's products. See G. Angelo & Co. v. Commissioner of Internal Revenue, 1 Cir., 36 F.2d 193; S. B. McMaster, Inc. v. Chevrolet Motor Co., D.C. S.C., 3 F.2d 469. Whatever control may be said to have been exercised by plaintiff over defendant, is not here decisive on the issue of the agency. One may submit to a degree of control by another without being his agent; and one may control the conduct of another without being a principal, and without giving to the other authority to bind him. In this case, it can be said that plaintiff desired to sell its products in such a manner that its interests might be promoted, and required as part of the price in the making of the contract, that defendant, to whom it sold, should submit to certain restrictions. Defendant was anxious to purchase plaintiff's product, and in order to purchase was willing to submit to the required conditions and restrictions.

Plaintiff claims that defendant secured the Chevrolet order through plaintiff's notification, and that it betrayed a trust, in using its own equipment in carrying out the contract. It appears, however, that plaintiff sold its products in the territory exclusively assigned to defendant, to others, during the term of the contract's existence. Whatever the facts with regard to these matters, they do not here affect decision of the legal question involved.

The contract was a sales contract, and not an agreement of agency.

But were we to conclude the contrary and hold that the relation between the parties was that of principal and agent, it would seem of no avail to plaintiff. If we put aside the controlling sales nature of the contract, and confine our discussion merely to the question of agency, we would, nevertheless, be obliged to hold that, considering defendant as an agent, such an agency would constitute the carrying on of plaintiff's business in the State of Michigan. Defendant was not merely a solicitor of sales. It performed extensive and necessary engineering services required by huge enterprises in order to enable it to submit proposals upon their work; it executed contracts on successful bids; it specified and ordered the manufacture of material to be furnished; it entered upon and performed the work of installing such factory equipment secured from the manufacturer; it carried on all of the negotiations with reference to such installation, and completion of the project, and made collection of the contract price. If it could be said to represent the plaintiff, it did everything in the State of Michigan that the foreign corporation could have done there in carrying on its business—except the manufacture of material—and it is inconceivable that plaintiff could have done more. We are of the opinion that all of these extensive activities, if carried on by an agent for a foreign corporation, would result in the doing of business by such corporation, through its agent.

Assuming that defendant was acting as plaintiff's agent in the conduct of its business in the State of Michigan, the carrying on of such business would be unlawful without compliance with the provisions of the Michigan statutes requiring that foreign corporations file their articles of association with the Secretary of State and.

procure a certificate of authority to do business in the State; and in default thereof, no such corporation can maintain an action on contract in the courts of that State. Act 327 of 1931, Secs. 94-97; Sec. 14027, Comp.Laws of Mich.1929. See also, Watkins v. Donnell, 192 Mo.App. 640, 179 S.W. 980.

■ But plaintiff contends that defendant was its agent for certain purposes only; and that this agency was of such a limited character that it did not constitute the carrying on of intrastate business by plaintiff through such agent. It, therefore, is urged that plaintiff is entitled to an accounting from the defendant agent and is not barred from maintenance of its action on the grounds of failure to comply with statutes regulating foreign corporations doing intrastate business in another state. In this argument, plaintiff relies on adjudications holding that a contract may be one of double aspect, contemplating purchases and sales, and also creating the relation of principal and agent. Champion Spark Plug Co. v. Automobile Sundries Co., 2 Cir., 273 F. 74; see also, Bendix Home Appliances, Inc. v. Radio Accessories Co., 8 Cir., 129 F.2d 177. But if it be assumed that defendant was an agent only for certain limited purposes—contrary to the opinion we have heretofore expressed, both as to the aspect of sales and that of agency—even that fact would not entitle plaintiff to an accounting in this case, for the reason that the aspect of the agreement relating to sales, controls—as in the Magrane-Houston case, supra—and vitiates the contract on grounds of public policy. This results from the provisions of Michigan statutes declaring illegal certain contracts in restraint of trade.

Under Secs. 16661, 16662 of the Compiled Laws of Michigan, 1929, all contracts and agreements made or entered into, the purpose or intent of which is to restrict, limit, control, or regulate the sale of any article of machinery, tools, implements, vehicles, or appliances designed to be used in any branch of productive industry, or to enhance or control or regulate the price thereof, or in any manner to restrict, limit, regulate, or destroy free and unlimited competition in the sale thereof, are illegal and void as in restraint of trade. Furthermore, contracts requiring that any particular make or brand of any article of machinery, tools, equipment, vehicles, or appliances designed to be used in any branch of productive industry, shall be dealt in or sold by either party to such contract to the exclusion of all other makes or brands of such article, are illegal and void.

■ One of the conditions of the agreement in this case was that defendant dealer would not sell any make of gravity conveyer other than that manufactured by plaintiff. Such an understanding would seem to bring the agreement squarely within the provisions of the Michigan statute, and results in the contract's being illegal and void.

■■ In this connection, it is contended by plaintiff that the contract in question was not made in the State of Michigan and, therefore, this statute has no application. However, where an agreement, made in one state, violates the public policy of another state in which the action is brought, it will not be enforced either by the courts of the forum or by federal courts sitting therein. Bond et al. v. Hume, 243 U.S. 15, 21, 37 S.Ct. 366, 61 L.Ed. 565. Union Trust Co. v. Grosman, 245 U.S. 412, 38 S.Ct. 147, 62 L.Ed. 368; May v. Mulligan, D.C.Mich., 36 F.Supp. 596, affirmed 6 Cir., 117 F.2d 259. It may further be observed that while Congress has the power to legislate with regard to interstate commerce, declaring certain contracts illegal if they tend to lessen competition, the states are not thereby pre-empted of the right to legislate as to matters of public policy with reference to contracts in restraint of trade. This right they have under their inherent police powers, and such statutes as are enacted thereunder, are to be presumed constitutional in default of a showing to the contrary, or unless, on their face, they are arbitrary and unreasonable.

■ While it is not essential to decision, in view of what has been previously said, a remaining question is raised by defendant, which contends that the contract was illegal and void under the Clayton Act. Section 3 of that statute, 15 U.S.C.A. § 14, provides that it shall be unlawful for any person engaged in commerce, in the course of such commerce, to make a sale or contract for the sale of goods, machinery or other commodities, or to fix a price charged therefor on the condition or understanding that the purchaser thereof shall not deal in such commodities of a competitor of the seller, where the effect of such understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. Under this stat-

ute there must be proof that the effect of the contract or understanding is that it may substantially lessen competition or create a monopoly. See Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; G. S. Suppiger Co. v. Morton Salt Co., 7 Cir., 117 F.2d 968. No required showing was made of such effect of the contract in this case.

There was no error in the holding of the district court, denying plaintiff an accounting from defendant on the ground of agency.

Unfair Competition

■ After the contract was terminated, defendant entered into the business of manufacturing the same products as were made by plaintiff. In order to designate the bearings which it manufactured, plaintiff had adopted certain numbers and symbols. As an instance, plaintiff's bearings were designated by the numbers 53, 57, and 63; and various types of dust-excluding seals used in the bearings were designated by the letters A, B, S, and SB. Defendant used substantially identical bearings, provided with substantially the same seals—which it designated by adding a zero to each of the numerals, and using the same letter symbols. The trial court found as a fact that defendant had not palmed off its goods as those of plaintiff and that its whole course of dealing had been such as to mislead no one into buying its products as those of plaintiff. In its conclusions of law, the trial court also included a finding that defendant "never represented to the public that the goods manufactured by it were products manufactured by plaintiff," and that "in its advertising and direct contact with purchasers it went to great lengths to inform customers that the goods it sold were not manufactured by the plaintiff." There was one incident in which it was claimed that defendant supplied equipment of its own manufacture on an order for plaintiff's equipment; but that was disputed and there was testimony that an official of defendant had asked for permission to substitute defendant's product. On a consideration of all the testimony on this question, it appears that the court's findings were amply supported and sustained by the evidence.

■ On its claim of unfair competition, plaintiff further showed that it had adopted and long used the expression, "The Continuous Flow Principle of Handling Ma-terials," which was included on its advertising material and on its goods that had been sold by defendant during the existence of the contract; and that this slogan was used in a circular which plaintiff had furnished to defendant and in which defendant was designated as plaintiff's representative. It is claimed that after the termination of the contract, defendant used the slogan in selling its own goods, and created the impression that it was still selling plaintiff's goods. From the evidence it appears that the words in the expression as used by plaintiff were capitalized, and appeared as a slogan. In defendant's circular, the words were used in a sentence, uncapitalized, in a descriptive text, in which defendant's name was repeatedly and prominently displayed, with no mention of plaintiff or its products or gravity conveyers. The expression describes an industrial system of handling materials, well known and understood in recent years, and is susceptible of common use in the parlance of the industry, or in ordinary speech by those conversant with mass production methods.

■ Plaintiff further complains that defendant, after the termination of the agreement, published a catalogue for use by the industry "to acquaint you with the diversity of our manufactured products." In this catalogue, containing hundreds of illustrations, there were reproduced approximately half a dozen photographs, taken originally by defendant, and showing installation by it of conveyers which had actually been manufactured by plaintiff. But it is impossible from the photographs to ascertain that such conveyers were manufactured by plaintiff or to know in which factories or plants they were installed. In the foregoing catalogue, there was included a title "Palmer-Bee Company Roller Conveyer—Gravity and Power Driven—Covered in Catalogue No. 112." In the catalogue referred to, are several black and white reproductions of drawings illustrating types of conveyers manufactured by defendant. These illustrations are claimed to have been copied from photographs of installations by defendant of plaintiff's products. The catalogue itself mentions only defendant's products and apparently, where feasible, the name of defendant company appears on the machinery as sketched. No claim of unfair competition can be predicated on the foregoing. We cannot see how it can be claimed that defendant misled

the public into buying its products in the belief that they were purchasing those manufactured by plaintiff—or that defendant was palming off its products as those manufactured by plaintiff. In no way can we see how plaintiff suffered any injury as the result of such conduct of defendant.

 The use by defendant of like numerals and letters as those used by plaintiff to designate similar bearings and seals, did not constitute unfair competition. See Deering Harvester Co. v. Whitman & Barnes Mfg. Co., 6 Cir., 91 F. 376. Nothing less than conduct tending to pass off one man's merchandise as that of another, constitutes unfair competition. Socony-Vacuum Oil Co., Inc. v. Rosen, 6 Cir., 108 F.2d 632. "Generally the question of whether or not a defendant has been guilty of unfair competition is one of law and fact and is for the trial court to determine. * * * Under the laws of Michigan, unfair competition consists in the simulation by one person of the name, symbols, or devices employed by another for the purpose of deceiving the public, or the substitution of goods or wares of one person for those of another, thus falsely inducing the purchase of his goods and obtaining the benefit belonging to a competitor. * * * Carbonated Beverages, Inc. v. Wisko et al., 297 Mich. 80, 297 N.W. 79." James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6, 13.

In view of the findings of the trial court, which are sustained by the evidence, and in accordance with the foregoing authorities, plaintiff's contentions that defendant was guilty of unfair competition, are without merit.

Copyright Infringement

 With regard to copies of two photographs of bearings appearing in plaintiff's copyrighted catalogue, and alleged to have been reproduced in black and white sketches by defendant, for its catalogue, it appears that while the photographs were used, in part, as models by a commercial artist employed by defendant, the sketches were made from defendant's own engineering shop detail drawings. Furthermore, they were drawn from a different angle than the bearings appearing in the photographs—and with different shading effects; they depicted bearings different in an important detail of design; and, therefore, could not be said to infringe the copyright. Two artist's sketches of a "roller spiral" and a "sheet metal spiral" repro-

duced from photographs appearing in certain circulars that had been distributed without notice of copyright, did not infringe. Two other artist's sketches in black and white in defendant's catalogue reproduced a roller switch and a frog from a photograph and an engineering drawing in plaintiff's copyrighted catalogue. The trial court found that defendant, in its reproduction, did not copy plaintiff's photograph and drawing.

Without discussing the contention that such finding was unsupported by the evidence, we are of the opinion that the issue on this phase of the case should be determined from a consideration whether there has been such a substantial infringement of plaintiff's right by defendant as would sustain a complaint based thereon.

The roller switch and the frog were in the public domain. Anyone could manufacture or sell them. Plaintiff's roller switch cut showed it as an engineering drawing in white line on a green background, with white lettering, designating the various parts and giving measurement from which the proportion and size could be generally ascertained. It was described as an "elevation." Defendant's drawing was in black and white, without descriptive words referring to parts or proportion.

Plaintiff's cut of the frog showed it as a photograph, with another frog directly above it, on which a package was being placed by a workman who was prominently represented in the picture. It further showed a part of the plant in which the frog was installed, together with two large packing boxes adjacent to the frogs. Defendant's reproduction was of one frog in black and white drawing.

 As has been said, infringement is a word not defined in the statute, but is assumed to be something already known to the law, and where the subject of copyright is a book, infringement consists in the copying of some substantial and material part thereof. Eggers v. Sun Sales Corp., 2 Cir., 263 F. 373. From numerous cases it may be concluded that in order to sustain an action for infringement of copyright, a substantial copy of the whole, or a material part, must be reproduced. See Perris v. Hexamer, 99 U.S. 674, 25 L.Ed. 308; Henry Holt & Co., Inc., to Use of Felderman v. Liggett & Myers Tobacco Co., D.C.Pa., 23 F.Supp. 302; Chicago Record-Herald Co. v. Tribune Ass'n, 7 Cir., 275 F. 797. Thus, where the proportion

taken is insignificant compared to the injury which would result from stopping a party's use of a large volume of independently acquired information, an injunction will be denied. Dun et al. v. Lumbermen's Credit Ass'n et al., 7 Cir., 144 F. 83. On the principle of de minimis non curat lex, it is necessary that a substantial part of the copyrighted work be taken. Hoffman v. Le Traunik, D.C.N.Y., 209 F. 375; Mead v. West Publishing Co., C.C.Minn., 80 F. 380. Among criteria for ascertaining infringement, which have been mentioned by the courts, are whether so much has been taken as would sensibly diminish the value of the original; and whether the labors of the party entitled to copyright are substantially to an injurious extent appropriated by another. Folsom v. Marsh, 9 Fed. Cas. pages 342, 343, No. 4,901.

 Like rules are applicable to the so-called fair use which may be made of copyrighted material, based upon the principle that subsequent workers in the same field are not deprived of all use thereof, as, otherwise, the progress of science and the useful arts would be unduly obstructed. Fair use is to be determined by a consideration of all of the evidence, and among other elements entering into the determination of the issue, are the extent and relative value of copyrighted material, and the effect upon the distribution of objects of the original work. New York Tribune, Inc. v. Otis & Co., D.C.N.Y., 39 F.Supp. 67. Whether a particular use of a copyrighted article, without permission of the owner, is a fair use, depends upon the circumstances of the particular case, and the court must look to the nature and objects of the selections made, the quantity and value of material used, and the degree in which the use may prejudice the sale, diminish the profits, or supersede the objects of the original work. Karll v. Curtis Pub. Co., D.C.Wis., 39 F.Supp. 836. As fair use is to be determined by a consideration of all the evidence in the case, so, likewise, is the question of infringement one of fact to be solved by a study of the evidence. Dun et al. v. Lumbermen's Credit Ass'n, supra.

From the evidence in this case, we have for consideration on the question of copyright, two cuts from a catalogue which are claimed to infringe. In defendant's catalogue are pictured approximately a thousand different items, and in plaintiff's several hundred. One cut in black and white line, without background and without lettering, is said to infringe upon an engineering drawing in white upon a solid green background, with white lettering. Another black and white sketch is claimed to infringe upon a photographic illustration containing much more in background than the single article itself.

 Considering the hundreds of photographs, engineering drawings, and black and white sketches, that appear in either one or the other of the catalogues; the fact that the articles pictured as being manufactured and sold by the parties, are in the public domain and can be manufactured and sold by anyone; that defendant could have easily photographed or drafted sketches from similar articles in use in industry, and made the same drawings therefrom; that defendant caused the exercise of a considerable degree of commercial art, and incurred a substantial expense in the production, in different media, of the sketches; that any injury to plaintiff from defendant's action in regard to these two sketches—of a character different from plaintiff's illustrations—is obviously infinitesimal; and that the alleged appropriation of the idea or form or perspective of plaintiff's two cuts from among the hundreds in its catalogue, is unsubstantial as an infringement of plaintiff's copyrighted book—we are in accord with the determination of the district court in dismissing plaintiff's claim based on infringement of copyright. The case of R. R. Donnelley & Sons Co. v. Haber, D.C. N.Y., 43 F.Supp. 456, cited by plaintiff, emphasizes the pertinence of a consideration of the special facts in this case. In the Donnelley case, the court, in sustaining a judgment for infringement of copyright, pointed out the substantial nature of a defendant's appropriation of the items in a plaintiff's catalogue, and recited that from plaintiff's catalogue of 152 pages, defendant had taken 107 pages in their entirety, and had reproduced 158 engravings, which had been made up by plaintiff's artists.

### Patent Infringement

Plaintiff claims defendant infringed its patent, Adams No. 1,720,255. The district court held the patent void. The rollers for roller conveyers are made of steel tubes. In order to assure the free spinning of such a roller or tube around the rod on which it rotates, ball bearings are used. These ball bearings are set in a "cage" which has a hole through its center.

These cages are inserted into each end of the tube. The rod on which the roller rotates goes through the cages at each end of the tube. The center or axial part of the cage does not rotate, being, for instance, hexagonal in shape, and fitting onto the like shape of the stationary rod. The outer part does rotate, being tightly affixed to the inner circumference of the tube or roller. Between the part of the cage pressed against the tube and the part fitting on the rod, are the ball bearings. The foregoing is not an exact description of the cage, but will serve for the purpose of this discussion. The "adapter" is a fitting to hold the cage in the tube or roller, and serves as a bridge for transmitting the load from the roller to the bearing. It is a circular piece of sheet metal, annular in form, being indented or pressed in a U-shape. If we view the U-shaped ring in cross section, one side of the U fits tightly along and around the sides of the circular cage, holding the ball bearings. The other side of the U fits tightly around the inside of the tube at its end. There is a circular flange on the side of the cage at the outer end of the tube. The end of one side of the U presses under and against the flange and prevents the cage from going further into the tube. Thus far, the cage cannot work into the tube; but it could work out of the end of the tube. It is plaintiff's contention that its patent adapter prevents this, and holds the cage firmly, and that the feature of novelty is "the provision of a recess near the outer end of the outer part of the U into which the end of the roller is pressed, as by swaging."

The trial court held that swaging the end of the conveyer tube or roller over an adapter, disclosed by the Buck patent, No. 1,445,821 (1923), would accomplish the same result that was claimed for the patent in suit, and that the mere mechanical skill required to produce such a result did not constitute invention. There seems no question that swaging the end of the tube over the Buck adapter would give practically the same result as plaintiff here claims for its patent; and swaging or pressing the end of a roller into a recess in a plug fitting in the end of a tube is clearly disclosed by a patent for a gravity conveyer in 1906. (Hiler No. 833,326.) A similar method was shown and a like result was secured in the Younkman patent, No. 1,243,375, in 1917.

From the testimony—apparently of plaintiff's witnesses—the court concluded that the claimed improvement was one that could be accomplished by mere mechanical skill in swaging a tube with a Buck adapter and that no invention resided therein.

Plaintiff relies on the presumptions arising from the issuance of the patent and the holding of the Board of Appeals of the Patent Office. It did consider certain patents which it referred to in its ruling, but these did not include that of Hiler; and the Board concluded that the way employed in the patent in suit was not necessarily an obvious one. The district court could reasonably find—and did —that the Board allowed the claim of the patent in suit on the ground that it was novel to swage the end of the roller into a recess adjacent to an outwardly projecting flange abutting against the ends of the roller. This was what the Hiler patent disclosed. Whatever the value and weight to be allowed the above-mentioned presumptions, they alone cannot sustain patents in the courts. In this case, the patent was simple, and the issue is easily understood. In sum, the question was whether swaging the end of a tube over a Buck adapter would be invention. The trial court held that in view of the previous art, it was not invention, and further, that such a swaging operation was one that would be accomplished by mechanical skill. The finding is sustained by the evidence, and we concur therein.

On plaintiff's claim of infringement of its patent, No. 1,876,534, the district court held the patent void on the ground that it was not new, and that the results achieved could be reasonably accomplished by any competent mechanic skilled in the art. The patent was for a more rigid adapter to hold the bearing cage, than was provided in the Buck or previous Adams patent. It was designed and intended to perform the same function—to provide a means for filling up the space between the inside of the roller cage, and to hold the cage firmly in place. One of its objects was to provide a "substantial and rugged support" for the bearing of heavier loads than the above-named patents.

Instead of being a single sheet of U-shaped metal in cross section, the adapter in question consists of two pressed steel members. The outer member is cylindrical,

fitting within the tube or roller, and having an annular shoulder at one end for the purpose of abutting against the edge of the roller. At the other end of this cylindrical member is an inwardly turned flange. The second member is a cup with an aperture through the center. At the upper circumference of the cup, the metal is turned outwardly and down to about half the depth of the cup. When the cup is fitted within the first member, its downwardly turned sides lie along and fit against the cylindrical sides of the outer member; and the turned-down edge of the cup rests on the inwardly turned flange of the outer member, so that the cup cannot work into the tube beyond the flange. This flange, upon which the turned-down edge of the cup rests, fits closely around the lower circumference of the cup itself. The cup is thus held by reason of its turned-down sides fitting tightly around the inner portion of the cylindrical member—and by reason of the flange of such member fitting around its lower part.

The trial court found that prior to filing application for the patent in suit, it was common practice to use telescoped or nested sheet-metal stampings to provide a plurality of spaced radial webs to carry radial loads; that many previous patents disclosed the combination of a pair of nested sheet-metal stampings telescoped to provide a pair of spaced radially extended webs or flanges through which radial loads were transmitted to a bearing cage; and that such webs performed the function of the webs of the structure shown in the patent in suit in precisely the same way.

The differences which existed between the structure shown in the patent in suit and the prior art constructions, were held by the court to be merely in details that represented the designer's choice of well-known mechanical expedients within the skill of any competent designer, and the result achieved, one that would be reasonably accomplished by any mechanic skilled in the art. A reference to the patents to Goldman, 914,714; Lister, 1,351,481; Jaenicke, 1,660,512; Beulke, 1,580,367; and Alvey, 1,141,515, together with the evidence on the trial, amply supported the court's findings that plaintiff followed the prior art, and that the differences disclosed in plaintiff's structure did not require the exercise of inventive genius.

■■■ Patent No. 2,023,718, held void by the court because disclosed by prior art, is

for a bearing comprising an inner and outer race, between which are located the balls. The outer race is surrounded by an exterior jacket, which is expanded at one end to form a space between ends of the race members and the jacket; the inner race (which is adjacent to the axis of the bearing) has an extension, and a space provided between the extension and the exterior jacket of the bearing, to permit of some radial play. On that extension is supported an L-shaped member, the vertical leg of which extends radially outwardly, adjacent the ends of the race members. A chamber is thus provided within the bearing, between the exterior jacket of the bearing and the vertical leg of the L-shaped member. In this chamber is a sealing means, or packing—which consists of felt—and which it is claimed obliges dust and grit to travel axially and radially from the outside through the chamber before reaching the balls and races.

In its fact findings, the court found that the patent followed the Dull patent, No. 1,772,711, with the addition of a felt washer, and that the use of felt packing was known to the art long before the claimed invention. The allowance by the Board of Patent Appeals of plaintiff's patent was predicated on the fact that in such a bearing the dust would have to travel both axially and radially to reach the balls and races, and, further, upon the provisions for axial play between the extension of the inner race and the inner end of the jacket. The Dull patent shows that dust would have to travel axially and radially —"through a labyrinth"—to reach the races; and the extension of Dull's "shell member" (similar to the jacket of the patent in issue) stops short of the extension of the inner race member, permitting some radial play in the same manner as set forth in plaintiff's patent.

The slightest modification of the Dull patent in an insignificant detail and use therein of a felt packing, would reproduce the patent in issue. The use of such packing appears in many bearing patents, and is obvious for sealing purposes. Both patents have a chamber in front of the balls and races. In the Dull patent a metal washer is placed in this inner chamber, closely fitting onto the inner race, and thus requiring dust which may come in at the opening, permitted by radial play, to proceed axially along the race and then radially over the top of the metal washer. The L-shaped member, which rests upon

the inner race of plaintiff's patent, does exactly the same thing.

While it is contended that the substitution of a felt washer for the metal washer, in the Dull patent, would not require dust to travel radially, nevertheless, the insertion of a felt washer or packing in the chamber, *without the removal of the metal washer*, would so require travel of dust, both radially and axially.

Although the patent in issue was repeatedly rejected by the Examiner, it was finally allowed by the Board of Appeals, predicated on the theories above mentioned. In all the documents mentioned in the proceedings on plaintiff's patent, in the Patent Office, the Dull patent was not mentioned; and it is a fair inference that it was not before the Board of Appeals, or it would not have allowed the patent. But whatever the situation on this point, we are of the opinion that the trial court's findings were sustained by the evidence, and with its disposition, we are in accord.

Plaintiff's fourth patent (Rishel, No. 2,077,188) was for a roller conveyer, consisting of a plurality of resilient roller supports, with a roller carried by each of said supports, and arranged to rotate freely irrespective of the weight of the load or the deflection of the supports, together with means for compressing the resilient supports independently of the weight of the rollers or load. The invention claimed is that of providing means of placing the springs under a precompression, substantially equal to the load to be carried by the rollers, when the load is uniformly distributed over a plurality of adjacent rollers, and so that yielding of the rollers out of the predetermined plane in which they are set in assembling the conveyer, would only occur due to unevenness in the lower surface of the load, which contacts with the rollers in its passage over the conveyer.

It is contended that Rishel taught the art that by providing the resilient mounting for the rollers, a much heavier load could be transported upon the same number of equal-capacity rollers rigidly mounted, or that an equal load could be transported on a smaller number of equal-capacity rollers rigidly mounted. It is argued by plaintiff that the patent discloses conveyer rollers, mounted upon resilient supports, preconditioned or precompressed to an extent related to the average uniformly distributed load below the maxi-mum weight which passes over the conveyer; and that an additional advantage of the patent is that it provides a shock absorber.

Springs for mounting a conveyer roller were disclosed by Lowy in his patent, No. 1,743,223, granted in 1930, for which application was filed in 1928. In this patent, single rollers were supported by springs, one at each end of the roller. The object, as stated, was to avoid the harmful effect of shocks to rollers. Haiss used springs to support conveyer rollers in a similar way (No. 1,778,526). The Saurer patent, No. 1,977,896, was for a mounting of two opposed structures of tubular resilient rubber for absorbing shock and progressively increasing resistance to distortion under load.

In the Bohn patent, No. 1,562,680, conveyer rollers were mounted upon springs so that with a load of a certain weight the springs would depress the rollers into contact with a wooden board beneath the conveyer, which would stop their rotation and act as a brake. Bohn taught that the springs could be adjusted so that the retarding action of the device became operative only when the load exceeded a certain predetermined weight.

Plaintiff's patent provided for "maintaining the spring elements under a predetermined compression, whereby the tension under which these springs are placed is such as to prevent the rollers from yielding to any appreciable extent when a load within the capacity of each individual roller passes over the conveyer, but which will permit each roller to yield when subjected to an overload."

The district court found that defendant's use of the resilient rubber blocks—similar to those in the Saurer patent—to support individual rollers, was not an infringement of plaintiff's patent, but was founded on prior art. On a review of the persuasive testimony on this point, and the record, our conclusion is that the trial court's findings were sustained by the evidence, and we are of the opinion that its findings were correct.

Furthermore, the trial court found that plaintiff's patent was invalid as it disclosed nothing, not taught by the Bohn patent. It is plaintiff's contention that its patent was for an entirely dissimilar purpose; that the Bohn patent was for a brake on conveyer rollers; and that plaintiff's patent was, briefly, for the purpose of achieving a uniform distribution of load on the roll-

ers. It is, therefore, argued that the Bohn patent was not an anticipation, inasmuch as the function performed by plaintiff's patent was of a completely different nature.

From a considerable mass of testimony, it appeared that, while the claims of the patents were different, and were based on the performance of different functions, the Bohn structure would function exactly as plaintiff's patent if the boards under the conveyer—which acted as brakes on the rollers when depressed by heavy loads—were removed, or even when the springs were adjusted without removal of the boards; and such an adjustment was provided for in the specifications of Bohn.

As remarked by Judge Denison, it often is not easy to determine whether the means employed accomplish a new result, or whether the means are only a new use of an old device,—a newly observed or discovered function of a well-known thing, not being invention. If there is a new structure or combination of means, the fact of a new result tends to indicate the presence of the inventive faculty. But when the means employed are wholly old, inherently as well as in their combination, results, which are apparently new, are only new or double uses, and do not partake of invention. Weir Frog Co. v. Porter, 6 Cir., 206 F. 670.

An old mechanism fully capable of a use not then observed, anticipates a later patent for the application of that means to the new use. Patentability cannot rest on the observation in a given device of a usefulness not before noticed; and the fact that a party did not in fact use his mechanism for a particular purpose, or even that he did not foresee that such purpose would be a useful one, is not material. William B. Mershon & Co. v. Bay City Box & Lumber Co., C.C.Mich., 189 F. 741. Discovery of new uses for, or newly observed functions of a device, well known in the mechanical or structural arts, is not patentable invention; Grand Rapids Refrigerator Co. v. Stevens et al., 6 Cir., 27 F.2d 243; and the use for which an apparatus was intended is irrelevant, if it could be employed without change for the purposes of the patent. Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823. For a full discussion of the foregoing subject, see opinion by Judge Simons in Page Steel & Wire Co. v. Smith Bros. Hardware Co. et al., 6 Cir., 64 F.2d 512.

Confronted with the Bohn patent, and its suggestion of adjustment of the springs supporting the rollers, an ordinarily skillful mechanic would not find it necessary to change the structure to have the same device and accomplish the performance of the same function as that disclosed by plaintiff's patent. The mere tightening of the springs in the Bohn patent would achieve everything claimed for plaintiff's patent. The fact that the old device was used for a function othe. than that set forth in the previous patent, would not negative anticipation; and the double use to which the structure could be adapted by a spring adjustment, would not be invention. See Tucker v. Spalding, 13 Wall. 453, 80 U.S. 453, 20 L.Ed. 515. The trial court's findings that plaintiff's patent was invalid were sustained by the evidence.

The decree of the district court, dismissing the bill of complaint, is affirmed.